SONITROL OF FRESNO, INC., et al., Plaintiffs,

v.

AMERICAN TELEPHONE AND TELEGRAPH COMPANY, et al., Defendants.

Civ. A. No. 83–2324.

United States District Court, District of Columbia.

March 6, 1986.

David S. Cohen, Cohen & White, Washington, D.C., Brian E. Moran, Chapman & Moran, Stamford, Conn., Robert N. Kaplan, Kaplan, Kilsheimer & Foley, New York City, William Knecht, Moraga, Cal., Henry M. Burwell, Barringer, Allen, Pinnex & Burwell, Greenville, S.C., for plaintiffs.

C. John Buresh, Sidley & Austin, David I. Shapiro, Joel B. Kleinman, Peter W. Morgan, Dickstein, Shapiro & Morin, Washington, D.C., for defendants.

## OPINION

JUNE L. GREEN, District Judge.

This matter is before the Court on the decision or recommendation of special master on motion for partial summary judgment re: state action immunity ("Special Master's Recommendation"); plaintiffs' motion for an order of the district court (1) setting aside the "decision or recommendation of special master on motion for partial summary judgment re: state action immunity" and (2) denying defendants' motion for partial summary judgment and memorandum in support thereof ("Plaintiffs' Motion to Set Aside"); defendants' opposition thereto ("Defendants' Opposition"); plaintiffs' reply; oral arguments on plaintiffs' motion; and the entire record herein.

For the reasons given below, the Court affirms the Special Master's Recommenda-

tion and denies Plaintiffs' Motion to Set Aside.

## I. *Background*

Plaintiffs filed the present action under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and the costs of suit against defendants for injuries sustained by plaintiffs resulting from violations of Sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1–3. Second Amended Complaint ¶ 1. Additionally, this action "arises under Section 16 of the Clayton Act, 15 U.S.C. § 26, to enjoin defendants from continuing the violations alleged herein and from entering as a competitor, for a period of three years, any of the [defined] markets...." *Id.*

Plaintiffs in this action are 43 Sonitrol companies which "[d]uring all or part of the relevant period, ... engaged in furnishing remote alarm systems to businesses and residences located in their [respective] geographic areas." Amended Complaint ¶ 8. The plaintiffs conduct business in the States of California, Massachusetts, Rhode Island, Texas, Tennessee, New York, Pennsylvania, Connecticut, Florida, Oklahoma, Colorado, Louisiana, Minnesota, New Mexico, Ohio, Michigan, Indiana, Washington, Oregon, North Carolina, Arizona, and South Carolina.

Defendants are American Telephone and Telegraph Company ("AT & T") and its present and former subsidiaries [1] that, until January 1, 1984, constituted the Bell System. AT & T "is engaged in the business, among others, of providing telecommunications services in the United States." Second Amended Complaint at 12.

Plaintiffs' complaint alleges, *inter alia*, that beginning sometime prior to 1971, defendants and their co-conspirators "engaged in an unlawful combination and conspiracy in unreasonable restraint of trade" and "have attempted to monopolize and have conspired to monopolize interstate trade and commerce" in violation of the Sherman Act. Second Amended Complaint ¶ 48. According to plaintiffs, "[d]efendants have restricted and controlled the growth and development of remote alarm system services in order to obtain for themselves a competitive position in the relevant market and sell defendants' services and equipment." [2] *Id.* ¶ 53.

---

**1.** At the time plaintiffs filed this civil action, AT & T conducted its business through its Long Lines Department ("AT & T Long Lines"), and in conjunction with Bell Telephone Laboratories ("Bell Labs"), Western Electric Company ("Western Electric"), American Bell, Inc., a.k.a. AT & T Information Systems ("ABI"), and the Bell Operating Companies ("BOCs"). AT & T controlled the BOCs, Western Electric, ABI, and Bell Labs through the ownership of stock. However, AT & T divested itself of the BOCs pursuant to an antitrust settlement approved by Judge Harold Greene of this court in *United States v. American Tele. & Tele. Co.,* 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom., Maryland v. United States, Tandy Corp. v. United States, North American Telephone Ass'n v. United States, and Illinois v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), which took effect on January 1, 1984.

Besides American Telephone and Telegraph Company, the other named defendants include Western Electric Company, Inc., American Bell, Inc., Bell Telephone Laboratories, Inc., Michigan Bell Telephone Co., the Mountain States Telephone and Telegraph Co., New England Telephone and Telegraph Co., New York Telephone Co., Indiana Bell Telephone Co., Inc., the Ohio Bell Telephone Co., Northwestern Bell Telephone Co., Pacific Northwest Bell Telephone Co., the Pacific Telephone and Telegraph Co., South Central Bell Telephone Co., the Bell Telephone Co. of Pennsylvania, Southern Bell Telephone Co., the Chesapeake and Potomac Telephone Co., the Chesapeake and Potomac Telephone Co. of Maryland, the Chesapeake and Potomac Telephone Co. of Virginia, the Chesapeake and Potomac Telephone Co. of West Virginia, Cincinnati Bell, Inc., Illinois Bell Telephone Co., New Jersey Bell Telephone Co., Wisconsin Bell, Inc., the Diamond State Telephone Co., and Bell Telephone Co. of Nevada. Second Amended Complaint at 6. These defendants will be referred to collectively as "AT & T" for the purposes of this opinion.

**2.** Until January 1, 1984, a consent order entered in *United States v. Western Electric Co., Inc. and American Telephone & Telegraph Co.,* 1956 Trade Cas. (CCH) ¶ 68,246 (D.N.J.1956), enjoined AT & T from engaging directly or indirectly through subsidiaries in any business other than the furnishing of common carrier communication services with certain limited exceptions. This consent decree acted as a legal barrier to defendants' entry into the alarm industry until it was vacated on August 24, 1982, as part of the approved antitrust settlement.

To further their plan, defendants allegedly developed "a program to restructure and reprice their private lines ("RPL program"). The RPL program involved actions by defendants, including their tariffs and marketing personnel, to manipulate and restructure defendants' alleged costs of providing private line services in order to unfairly achieve huge increases in private line rates," *id.* ¶ 37, and thereby cause a "migration" of plaintiffs' customers to Bell equipment, facilities, and services.[3]

Furthermore, plaintiffs allege that defendants utilized various predatory and anticompetitive acts including, but not limited to,

[filing] sham and excessive tariffs with federal, state and local regulatory agencies which, among other things, priced local and interstate private line service required by plaintiffs without regard to the actual cost of such services, required the use of unnecessary interface devices, and imposed unjustified and restrictive terms and conditions for the use of private line services; [and]

[p]rovid[ing] incomplete, misleading and erroneous information to federal, state and local regulatory agencies regarding the purpose, need and justification of the aforesaid tariffs.

Second Amended Complaint ¶ 56, subparts n and o.

As a result of defendants' actions, plaintiffs estimate that they have sustained no less than $200 million in damages from the substantial loss and damage to their business and property. Plaintiffs also seek injunctive relief from the Court to prevent defendants from "continu[ing] to employ similar anticompetitive acts and practices... which will cause plaintiffs further and substantial irreparable injury for which there is no adequate remedy at law." *Id.* ¶ 56.

Defendants filed an answer which asserts, *inter alia,* that the activities of which plaintiffs complain are not subject to the antitrust laws because they are regulated pervasively by the Federal Communications Commission under the Communications Act of 1934, as amended, 47 U.S.C. §§ 151 *et seq.,* and by state regulatory agencies under regulatory statutes applicable in the various states where defendant operating companies are located and do business. Defendants contend that their actions "have been and are in accord with the purposes of the regulatory statutes and affirmatively expressed governmental policies whose implementation has been actively supervised by the regulatory agencies." Defendants' Answer at 1–2.

Defendants also aver that plaintiffs "seek recovery for defendants' participation in the legislative, judicial and regulatory processes, and for other activities which are protected under the antitrust laws." Defendants' Answer at 3.

Given the complex nature of the case and pursuant to Rule 53 of the Federal Rules of Civil Procedure, the Court appointed Professor Sherman Cohn of Georgetown University Law Center as Special Master in this matter on April 4, 1984. As Special Master, Professor Cohn handles discovery matters and issues recommendations on some substantive claims, one of which is presently before the Court.

During the course of this complex litigation, defendants filed before the Special Master a motion for partial summary judgment dismissing certain plaintiffs' claims insofar as they claim injury by reason of telephone rates in California, Connecticut, New York, North Carolina, and Ohio. ("Defendants' Motion for Partial Summary Judgment").[4] The basis of defendants' mo-

---

**3.** Plaintiffs cite defendants' operation "SUN-RAY" as an example of the type of services intended for use by defendants to lure away Sonitrol customers. Operation SUNRAY is "an enhanced services package for residential and business telephone subscribers" which "will offer customers an array of electronic services, such as home banking, electronic yellow pages, meter reading and alarm service." Second Amended Complaint ¶ 49.

**4.** As noted by the Special Master in his recommendation, while defendants' motion is limited to the Sonitrol plaintiffs in only five states, "the basic principles involved concern all of the Sonitrol plaintiffs." Decision or Recommendation

tion was the state action immunity doctrine which shields certain anticompetitive activities from the antitrust laws.

Defendants argued

that the intrastate private line rates charged in all of the states and at all of the times pertinent to this litigation are shielded by the state action doctrine because all such rates have been regulated by public utility commissions under statutory schemes expressly designed to protect the public interest by substituting comprehensive regulation for conventional market forces. All of plaintiffs' claims challenging defendants' rates as excessive, therefore, should ultimately be dismissed.

Memorandum in Support of Defendants' Motion for Partial Summary Judgment Dismissing Certain Plaintiffs' Claims Insofar as They Claim Injury by Reason of Telephone Rates in California, Connecticut, New York, North Carolina, and Ohio ("Memorandum in Support of Defendants' Motion for Partial Summary Judgment") at 2.

Plaintiffs opposed defendants' motion and argued (1) that defendants' use of monopoly power in a regulated market to restrain trade in and attempt to monopolize an unregulated market is not state action; therefore, the state action immunity doctrine does not apply, Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendants' Motion for Partial Summary Judgment Dismissing Certain of Plaintiffs' Claims Insofar as They Claim Injury by Reason of Telephone Rates in California, Connecticut, New York, North Carolina and Ohio ("Plaintiffs' Opposition to Partial Summary Judgment") at 15–25; (2) that even if defendants' private-line pricing satisfied requirements for state action exemption, it would not be exempt state action since it was part and parcel of a larger monopolistic scheme, *id.* at 29–33; and (3) that defendants' affirmative misrepresentation of key facts to state regulatory

of Special Master on Motion for Partial Summary Judgment Re: State Action Immunity ("Special Master's Recommendation") at 2. Accordingly, the Court's decision on the issue of de-

bodies vitiates any state action exemption that might otherwise apply. *Id.* at 34–42.

The Special Master heard oral arguments on the motion for partial summary judgment and post-hearing memoranda were submitted. After consideration of the voluminous materials before him and the oral arguments, the Special Master granted defendants' motion. It is from this recommendation of the Special Master that plaintiffs appeal and move the Court to set aside the Special Master's recommendation and deny defendants' motion for partial summary judgment.

In his recommendation, the Special Master found (1) that defendants' actions before the state rate commissions were immune from the antitrust laws under the two-pronged test for state action immunity set forth in *California Retail Liquor Dealers v. Midcal Aluminum,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980); (2) that defendants' use of regulated activity to affect adversely competitors' unregulated activity falls within state action immunity; (3) that defendants' misrepresentations to state commissions in rate proceedings do not vitiate state action immunity for those rates; and (4) that defendants' actions retain their state action immunity even though they are part and parcel of a larger monopolistic scheme. The Court will consider each finding of the Special Master in order.

## II. *Discussion*

### A. *Applicability of the State Action Immunity Doctrine*

The Supreme Court first enunciated the doctrine of state action immunity to the federal antitrust laws in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). The Court established a two-pronged test to determine the applicability of the doctrine in *California Retail Liquor Dealers v. Midcal Aluminum,* 445 U.S. at

fendants' state action immunity defense will apply to any subsequent motions by the other Sonitrol plaintiffs to which this doctrine may apply.

105, 100 S.Ct. at 943. In order to qualify for state action immunity

> [f]irst, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy;" [and] second, the policy must be "actively supervised" by the State itself.

*Id.* (citation omitted). Although the *Parker* decision involved an action against a state official, the Court made clear recently in *Southern Motor Carriers Rate Conference v. U.S.,* — U.S. ——, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985), that the reasoning in *Parker* extends to suits against private persons.

As already noted, the Special Master concluded in his recommendation that,

> [t]here is little, if any question that the *Midcal* tests are met in the instant case. The memoranda of the telephone companies amply demonstrate that fact. The Sonitrol pre-hearing memoranda makes, at best, a half-hearted argument to the contrary. And in the several post-hearing memoranda that have been filed, Sonitrol makes no effort to bolster that argument. It is apparent that each of the *Midcal* tests has been met: the states have clearly articulated a policy to regulate telephone rates and, through extensive rate hearings and through failure to rubberstamp applications, it is clear that the states actively supervise this anticompetitive conduct. If there is any state in which supervision is missing and rate applications routinely are approved *pro forma* without hearing or change, it has not been pointed out to the Special Master and is otherwise unknown to him.

Special Master's Recommendation at 6. While disagreeing perhaps with the Special Master's characterization of plaintiffs' arguments, the Court finds that it must agree with his ultimate conclusion on the issue.

Plaintiffs argue that the *Midcal* tests have not been met. First, they point to the facts that "[t]he BOC's repricing and restructuring of private lines and the pricing policies and costing methods utilized by them at rate hearings *were initiated by AT & T and the BOC's and were not compelled by any state regulatory statute or commission.*" Plaintiffs' Motion to Set Aside at 7 (emphasis added); *see generally,* Affidavit of Dr. Lee L. Selwyn, Attached to Plaintiffs' Opposition to Partial Summary Judgment ("Selwyn Affidavit"). Plaintiffs conclude, therefore, that defendants' RPL program cannot be considered to be the result of "clearly articulated and affirmatively expressed" state policy.

Plaintiffs' argument appears to suggest that the first prong of the *Midcal* test requires some showing of compulsion by State policy to engage in anticompetitive conduct. The Supreme Court, however, rejected that argument in *Southern Motor Carriers v. U.S.,* 105 S.Ct. at 1728–30. The Court stated that "a state policy that expressly *permits,* but does not compel, anticompetitive conduct may be 'clearly articulated' within the meaning of *Midcal.* . . .[W]hen other evidence conclusively shows that a State intends to adopt a permissive policy, the absence of compulsion should not prove fatal to a claim of *Parker* immunity." *Id.* at 1729–30.

■ The Court finds that there can be no clearer example of a "clearly articulated and affirmatively expressed" state policy permitting restraint of competition than that involved in the instant case. Federal and state agencies have long been involved in the pervasive regulation of the telecommunications market. Even plaintiffs and defendants proved this point through their submission of memoranda and documents describing in detail the functions of the various state regulatory bodies charged with overseeing the telecommunications market in their respective areas. Defendants' Motion for Partial Summary Judgment at 29–187; *see generally,* Affidavit of Mark W. Gaffney, Attached to Plaintiffs' Opposition to Partial Summary Judgment ("Gaffney Affidavit"). The Court finds, therefore, that the first prong of the *Midcal* test is met.

■ The second prong of the *Midcal* test is also met easily. Plaintiffs would have

the Court hold that the states did not actively supervise defendants' anticompetitive conduct due to defendants' misrepresentations and abuses of processes in numerous proceedings before state commissions. The focus in the *Midcal* test, however, is not on the actions of the defendants before the state commissions but on the states' level of supervision of defendants' anticompetitive conduct.

■ As mentioned above, both sides submitted extensive and detailed memoranda which demonstrate that the state commissions supervised heavily the rate approval process. The fact that defendants may have made misrepresentations to the state commissions does not change the fact that telephone line rate approval is a major function of the state commissions in question requiring their active participation and close supervision in the adjudicatory process and the implementation of the determined rates.

■ As the Fifth Circuit stated so well in *Jeffrey v. Southwestern Bell*, 518 F.2d 1129 (5th Cir.1975):

> Our view is that the *Parker* exclusion applies to the rates and practices of public utilities enjoying monopoly status under state policy when their rates and practices are subjected to meaningful regulation and supervision by the state to the end that they are the result of the considered judgment of the state regulatory authority.

*Id.* at 1134 (quoting *Gas Light Co. of Columbus v. Georgia Power Co.*, 440 F.2d 1135, 1140 (5th Cir.1971), *cert. denied*, 404 U.S. 1062, 92 S.Ct. 732, 30 L.Ed.2d 750 (1972)). "Regulation by a governmental body of the rates to be charged by a public utility are a classic example of the *Parker v. Brown* exemption." *Id.* Accordingly, the Court concludes that the second prong of the *Midcal* test is met and affirms that part of the Special Master's recommendation that holds the same. The state action immunity doctrine, therefore, applies to defendants' anticompetitive conduct.

## B. Applicability of State Action Immunity Doctrine to Regulated Activity which Adversely Affects Unregulated Activity

Next, the Court must consider the Special Master's rejection of plaintiffs' argument that the state action immunity doctrine does not apply where regulated activity (telephone rates) impacts adversely upon unregulated activity (the alarm industry). In his recommendation, Special Master Cohn discussed the principal case relied upon by plaintiffs to support their proposed exception to state action immunity and the Court will follow his lead.

Plaintiffs rely heavily on *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). *Cantor* involved an action brought by a retail druggist selling light bulbs against Detroit Edison who claimed that the latter was using its monopoly power in the distribution of electricity to restrain competition in the sale of light bulbs in violation of the Sherman Act. Detroit Edison distributed electricity and electric light bulbs to about five million people in southeastern Michigan. It was the sole supplier of electricity in this marketing area and for many years supplied its customers with almost 50 percent of the standard-size light bulbs used by them. *Id.* at 582, 96 S.Ct. at 3113. The customers were billed only for the electricity consumed and not for the light bulbs which were provided free of charge through a program funded by tariffs approved by the Michigan Public Service Commission. The Supreme Court found that while the Commission regulated pervasively the distribution of electricity in Michigan, the distribution of electric light bulbs in Michigan was unregulated. *Id.* at 584, 96 S.Ct. at 3114–15. The Court went on to hold that the State of Michigan's approval (through its Public Service Commission) of Detroit Edison's tariff was not a sufficient basis for implying an exemption from the federal antitrust laws under the state action immunity doctrine for its light bulb distribution program. The Court stated that "[t]here is no logical inconsistency between requiring ... [Detroit Edison] to

meet regulatory criteria insofar as it is exercising its natural monopoly powers and also to comply with antitrust standards to the extent that it engages in business activity in competitive areas of the economy." *Id.* at 596, 96 S.Ct. at 3120.

■ The plaintiffs are correct when they cite *Cantor* for the proposition that "state action exemption from the antitrust laws is unavailable for anticompetitive practices of regulated public utilities directed at unregulated markets." Plaintiffs' Opposition to Partial Summary Judgment at 18. However, the plaintiffs go on to defeat the strength of their argument when they state expressly that the basis of the Court's ruling in *Cantor* was "among other reasons, [that] Michigan and its Public Service Commission had *no regulatory policy with respect to light bulbs (as opposed to the distribution of electricity) or the light bulb exchange program.*" *Id.* (emphasis added).

The Court has determined already that the anticompetitive activity of which plaintiff complains in the instant matter, unlike that in *Cantor*, is regulated pervasively by the respective state commissions and, therefore, protected from challenge under the state action immunity doctrine. The facts in *Cantor* can be distinguished easily from those presented in this case, and for this reason, the ruling in *Cantor* is not controlling.

The Special Master went even further in distinguishing *Cantor* on its facts from the case at bar. He stated that,

> [t]he instant case is not *Cantor*. The conduct of the telephone companies complained of here was not the engaging of activity in the alarm field. Rather, Sonitrol complains that regulated activity of the telephone companies has an *effect* in the unregulated field of the alarm business by increasing its costs for the purchase of certain regulated services.

Special Master's Recommendation at 8. Furthermore, the Special Master found that *Cantor* and the other cases relied upon by Sonitrol provided little support for its argument.

In those cases the regulated firm was engaging in unregulated activity and attempted to shield itself from antitrust considerations by including its unregulated acivity [sic] in a tariff submitted to and approved by a state agency charged with supervising its regulated activity. Here, ... the complaint is that clearly regulated activity—telephone rates—adversely impacts an unregulated activity. *Id.* at 9–10.

■ The Court is compelled to agree with the Special Master. The state commissions in adopting and enforcing the telephone rates requested by defendants "imposed the restraint [of trade] as an act of government which the Sherman Act did not undertake to prohibit." *Parker v. Brown*, 317 U.S. at 352, 63 S.Ct. at 314. (citations omitted). "A state's antitrust immunity springs from an essential principle of federalism, the necessity to respect a sovereign capacity in the several states." *Llewellyn v. Crothers*, 765 F.2d 769, 774 (9th Cir.1985) (citing *Hoover v. Ronwin*, 466 U.S. 558, 104 S.Ct. 1989, 1995–96, 80 L.Ed. 2d 590, *reh. denied*, — U.S. —, 104 S.Ct. 3564, 82 L.Ed.2d 865 (1984)). Given this purpose, it follows that actions otherwise immune should not forfeit that protection merely because they impact adversely upon unregulated activity. For the foregoing reasons, the Court affirms the Special Master's ruling that the state action immunity doctrine applies to prevent antitrust liability even where regulated activity has an adverse effect on unregulated activity.

C. *Applicability of State Action Immunity Doctrine to Defendants' Alleged Tactics of Deception and Misrepresentation*

Special Master Cohn also rejected plaintiffs' argument that defendants' affirmative misrepresentations in private line rate hearings vitiated any state action exemption that might otherwise apply to their activities. As noted by the Special Master, plaintiffs rely heavily on the holdings in *California Motor Transport v. Trucking*

*Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), and *Woods Exploration & Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286 (5th Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), to support its proposition. Special Master Cohn, however, found that "[a] close examination of these cases, and others relied upon by Sonitrol, show that they concern situations quite different from that of the instant case." Special Master's Recommendation at 12. The Court agrees and finds that the facts underlying the decisions in both *Woods* and *California Motor Transport* support the Special Master's ruling.

*California Motor Transport* involved allegations by California trucking companies that its competitors carried out jointly a plan to oppose in regulatory governmental agencies and reviewing courts all applications for operating rights that were filed by competitor carriers. The plaintiff trucking companies alleged that "the power, strategy, and resources of the [defendants] were used to harass and deter respondents in their use of administrative and judicial proceedings so as to deny them 'free and unlimited access' to those tribunals." *California Motor Transport v. Trucking Unlimited,* 404 U.S. at 511, 92 S.Ct. at 612. As a result of defendants' activities, plaintiffs complained that the machinery of the agencies was effectively closed to them.

The Supreme Court in *California Motor Transport* concluded

(1) that any carrier has the right of access to agencies and courts, within the limits, of course, of their prescribed procedures, in order to defeat applications of its competitors for certificates as highway carriers; and (2) that its purpose to eliminate an applicant as a competitor by denying him free and meaningful access to the agencies and courts may be implicit in that opposition.

However, the Court continued and stated that,

First Amendment rights may not be used as the means or the pretext for achieving "substantive evils" ... which the legisla-

ture has the power to control.... A combination of entrepreneurs to harass and deter their competitors from having "free and unlimited access" to the agencies and courts, to defeat that right by massive, concerted, and purposeful activities of the group are ways of building up one empire and destroying another.... If these facts are proved, a violation of the antitrust laws has been established. If the end result is unlawful, it matters not that the means used in violation may be lawful.

*Id.* at 515.

Plaintiffs argue that defendants' misrepresentations to the state rate commissions exemplify the type of "illegal and reprehensible practice which may corrupt the administrative or judicial process and which may result in antitrust violations," under the analysis discussed in *California Motor Transport.* *Id.* at 513, 92 S.Ct. at 613. Special Master Cohn, however, reached a different conclusion after a comparison of the facts plaintiffs allege in this case and those involved in *California Motor Transport,* and held that the latter case was not controlling.

In his recommendation, the Special Master concluded that,

[h]ere there was no attempt at effective denial of access to the administrative process, as in *California Motor Transport. Indeed, the telephone companies invoked that process in filing tariff applications.* And, from the detailed description of [Attorney Mark] Gaffney, it is clear that there was extensive participation in that process by those who opposed the telephone companies' tariffs.

Special Master's Recommendation at 14. The Court agrees with the Special Master.

Plaintiffs submitted various memoranda and accompanying materials which buttress the Special Master's conclusion. For example, they submitted the lengthy affidavit of Attorney Mark Gaffney, co-counsel for plaintiffs. This document not only contains evidence of defendants' alleged national monopolistic scheme to enter the alarm market someday but also shows that

the various state rate commissions were quite aware of plaintiffs' claims of intentional misrepresentation by defendants of their intention to enter eventually into that market and their alleged nondisclosure of relevant and material documents which would prove that intention.

For instance, Mr. Gaffney alleges that New York Telephone ("NYT"), together with AT & T, affirmatively misrepresented to the New York Public Service Commission that they had no intent to offer alarm services and no plan to migrate the alarm market from private lines to the switched network. Gaffney Affidavit at 39. He also alleges that NYT made false and misleading responses to interrogatories submitted during hearings before the New York Public Service Commission in Case No. 27995 in August 1981. Gaffney Affidavit ¶ 84. In that very same case, Mr. Gaffney claims that in September 1981, AT & T refused to produce the so-called "Texas 20" documents that it had produced in Texas in August 1981 under a protective order. These documents concern AT & T's alleged intent to enter the alarm market. Gaffney Affidavit ¶ 85.

However, a close examination by the Court of the proceedings held before the New York Public Service Commission in Case No. 27995 does nothing more than point out the soundness of the Special Master's conclusion that "unlike *California Motor Transport,* there was no attempt at denial of access to the decisional process" by defendants. Special Master's Recommendation at 15.

On May 6, 1981, the New York Telephone Company filed with the New York Public Service Commission ("N.Y. Commission") proposed tariffs designed to increase its revenues by 20.6 percent or $888.9 million during the year ending March 31, 1983. Opinion No. 82–6, Cases 27995, 27710, *Re New York Telephone Co.,* Opinion and Or-

der Determining Revenue Requirement and Rate Structure, March 26, 1982 ("N.Y. Commission Opinion") at 2. The N.Y. Commission suspended the proposed tariffs through April 13, 1982, and instituted Case No. 27995 so its staff and intervenor parties could examine the proposed rates and the company's arguments in support of the increase.

Hearings in Case No. 27995[5] were held during the period through November 1981, before selected Commissioners who presided at one or more hearings throughout the State. The Commissioners heard statements by members of the public who appeared at morning and afternoon hearings held in Albany, Buffalo, Mineola, New York, Syracuse, and Utica. The Commissioners received testimony during 39 days of evidentiary hearings, resulting in a record of approximately 14,300 pages and 350 exhibits. The Court notes with interest that Dr. Lee Selwyn, one of plaintiffs' chief affiants, testified in these hearings on behalf of Suffolk and Nassau counties.

Initial and reply briefs were filed by the N.Y. Commission's staff; New York Telephone; a consortium of government entities comprising the N.Y.S. Assembly Committee on Corporations, Authorities, and Commissions, N.Y.S. Consumer Protection Board, N.Y.S. Department of Law, N.Y.S. Legislative Commission on Science and Technology, N.Y.C. Comptroller's Office, N.Y.C. Department of Consumer Affairs, and Manhattan Borough President; *a large group of alarm companies, including plaintiffs;* the Association of Telephone Answering Services; Bedford-Stuyvesant Community Legal Services; the Committee of Corporate Telephone Users; the Communications Workers of America; the Counties of Nassau and Suffolk; Midstate Telephone; the New York Public Interest Research Group; the N.Y.S. Interconnect

---

**5.** The New York Public Commission consolidated the coin service rate aspects of Case No. 27995 with Phase II of Case No. 27710, a proceeding which they had instituted in response to coin service rate proposals advanced initially in New York Telephone Company's August 1981 second filing. Therefore, the hearings mentioned above also include testimony and evidence as to Phase II of Case No. 27710.

Association; the N.Y.S. Telephone Association; the U.S. General Services Administration; and the User Parties (comprising the American Broadcasting Company, Columbia Broadcasting System, General Electric, and Mobil Oil). N.Y. Commission Opinion at 3 (emphasis added).

After reviewing all the evidence presented, the N.Y. Commission concluded that New York Telephone *"requires* an increase, in annual revenues, of 9.5%—i.e., $408.3 million—to cover a reasonable level of forecasted expenses and attract the capital the company will need in continuing to provide adequate service." *Id.* at 5 (emphasis added). The N.Y. Commission reached its conclusion despite noncompliance with "repeated demands for documents from the telephone companies" like the "Texas 20", the "repeated objections on grounds of relevancy, materiality, confidentiality and [the] proprietary nature of the documents." Special Master's Recommendation at 15.

The scenario described in the N.Y. Commission's proceedings in Case No. 27995 was repeated in similar rate commission proceedings in the States of California, Connecticut, North Carolina, and Ohio. Given those facts, the Court is hard pressed to find that plaintiffs, as well as numerous other interested parties, were denied effective access to the decisional process due to any alleged misrepresentations by defendants. On the contrary, plaintiffs had considerable opportunities to express their viewpoints and to protect their interests through participation in that process. Accordingly, the Court finds, as did the Special Master, that the holding in *California Motor Transport* is not controlling.

Plaintiffs' reliance on *Woods Exploration & Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286 (5th Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), is also misplaced. In *Woods,* plaintiffs alleged that defendant gas producers attempted to subvert the Texas Railroad Commission's scheme for regulating production of natural gas. Defendants agreed among themselves to obstruct and frustrate extraction of gas by other producers like plaintiffs by filing false production forecasts with the Commission so as to reduce plaintiffs' production levels.

The Fifth Circuit found that the facts of that case were unlike those in other cases where the governing authority's decision was premised upon false information and the adverse result to plaintiffs "flowed from state rather than private action." *Id.* at 1295. Here, the court stated, plaintiffs alleged that the Texas Railroad Commission's production allowable order rested upon false facts adduced by defendants. The court found that,

> [t]here was, moreover, no opportunity for meaningful supervision or verification. *Because of the amount and character of nomination predictions, the Railroad Commission of necessity must rely on the truthfulness of the gas producers.* Such facts are usually in the exclusive control of those producers, *so the final order of the Commission often must accept the nominations at face value.* Hence, defendants' conduct here can in no way be said to have become merged with the action of the state since the Commission neither was the real decision maker nor would have intended its order to be based on false facts.

*Id.*

Plaintiffs contend that like *Woods,* the state rate commissions had no opportunity for meaningful supervision or verification since the defendants made misrepresentations of facts within their exclusive control which were not readily available. The Special Master disagreed and found instead that "unlike *Woods,* there was ample opportunity for commissions to probe the validity of [the] telephone companies' submissions and for those opposed to the telephone companies to aid the commissions in those probes." Special Master's Recommendation at 15–16. He based his conclu-

sion on plaintiffs' submitted affidavits and an examination of the rate proceedings held by the respective state rate commissions, which "show[ed] the extensiveness of these adversary proceedings and the amount of probing that went on." *Id.* at 16. An examination by the Court of these same documents leads it to the same conclusion.

■ There can be no reasonable doubt that plaintiffs presented the claims in question to the various state rate commissions before whom they appeared. How the commissions viewed those claims is not altogether apparent or perhaps relevant to this inquiry. What is apparent and relevant, however, is the fact that interested parties like plaintiffs had access to the decisional process, through, for example, participation in public hearings on the proposed rates, and that the commissions had ample opportunity, given the adversarial nature of the proceedings, to probe the veracity of the statements made by all persons involved. For a Federal court now to disregard the state action immunity doctrine and disturb those commissions' orders based on plaintiffs' representation that a different order was warranted does indeed prove too much given the facts presented in this case.

Accordingly, the Court holds that based on the facts presented in this case the state action immunity doctrine applies even in the light of plaintiffs' claims regarding defendants' alleged tactics of deceit and misrepresentation.

D. *Applicability of State Action Immunity Doctrine Where Protected Anticompetitive Conduct is Part of Larger Monopolistic Scheme*

Lastly, the Court must review the Special Master's determination that state action immunity should apply "where the claimed state action was procured as one facet of a broader plan of a larger monopolistic scheme that includes elements that are not subject to the immunity." Special Master's Recommendation at 18.

Plaintiffs argue that "[i]t is a fundamental canon of antitrust law that otherwise innocent behavior may violate the Sherman Act when considered together with the remainder of the conduct." Plaintiffs' Opposition to Partial Summary Judgment at 32. Based on this proposition, plaintiffs conclude that "partial summary judgment must be denied with respect to defendants' private line pricing which was simply one episode forming part of defendants' anticompetitive course of conduct directed at the alarm market." *Id.* at 33.

Plaintiffs cited several cases in support of their argument but the Special Master found that "none of those cases involve protected activity. There is an obvious difference between otherwise innocent conduct that occurs as a part of a larger, nefarious scheme, on the one hand, *and conduct that is protected even if it would be unlawful if not protected.* Sonitrol makes no attempt to address this distinction." Special Master's Recommendation at 18–19 (emphasis added). A review of the cases cited by plaintiffs leads the Court to the same conclusion.

One of the cases cited by plaintiffs in support of their motion to set aside is the Seventh Circuit's opinion in *City of Mishawaka v. Indiana & Michigan Power Co., Inc.,* 560 F.2d 1314 (7th Cir.1977), *cert. denied,* 436 U.S. 922, 98 S.Ct. 2274, 56 L.Ed.2d 765 (1978). *City of Mishawaka* involved a "price squeeze" by a monopoly electric utility company which charged its wholesale customers, local municipalities which owned and operated transmission systems and depended on the utility for their wholesale supply, a wholesale rate high enough to impede the municipalities' competition in the retail market. The utility's wholesale rates were subject to regulation by the Federal Energy Regulatory Commission and its retail rates were subject to regulation by either State Public Service Commissions or directly by the State. The local municipalities, challenged

this dual rate structure and the court held that,

> [t]he state utility commissions have only put the imprimatur of their sanction on the retail rates charged by the defendant. *The price squeeze has not been blessed by Indiana or Michigan.* The fact that the district court has no authority to maintain a direct attack on the defendant's retail rates does not alter the reality that the state commissions have in no way placed a badge of approval on the defendant's dual rate structure. Consequently, defendant's conduct is not immunized under *Parker v. Brown.*

*Id.* at 1320 (emphasis added).

It appears to the Court that the holding in *City of Mishawaka* turns on the fact that the challenged anticompetitive conduct was not approved by the state regulatory commissions, thus removing any possible barrier of state action immunity. The situation is very different in the instant matter. Here, the challenged anticompetitive conduct is protected activity and not subject to antitrust liability. Plaintiffs' argument is weakened further, as noted by the Special Master, given the decisions in *United Mine Workers v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593–94, 14 L.Ed.2d 626 (1965) ("Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act."), and *Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n,* 663 F.2d 253 (D.C.Cir.1981), which likewise rejected arguments similar to plaintiffs'.

█ The Court, therefore, concludes that protected anticompetitive conduct which derives its immunity under either the *Parker* state action immunity or the First Amendment right to petition, remains free from antitrust liability even if it is part and parcel of a larger monopolistic scheme. Accordingly, the Court affirms the Special Master's ruling on this issue.

### III. *Conclusion*

█ Based on the foregoing, the Court holds that the Special Master's Recommendation granting defendants' motion for partial summary judgment is based on a sound reading of the applicable law. The Court hereby affirms his recommendation in its entirety. In so doing, the Court does not intend to condone the reprehensible tactics plaintiffs allege that AT & T used before the state rate commissions. The Court merely holds, as did the Special Master, that "these rates cannot themselves be used as bases of antitrust liability" given the application of the state action immunity doctrine to defendants' anticompetitive conduct, "nor can injuries resulting from the rates be considered as damages in the suit." Special Master's Recommendation at 20.

> It would of course still be within the province of the [Court] to admit this evidence, if [it] deemed it probative and not unduly prejudicial, under the "established judicial rule of evidence that testimony of prior or subsequent transactions, which for some reason are barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose of the particular transactions under scrutiny."

*United Mine Workers v. Pennington,* 381 U.S. at 670, n. 3, 85 S.Ct. at 1593, n. 3 (citations omitted). Therefore, the Court will allow plaintiffs to submit at trial any probative and nonprejudicial evidence of defendants' activities before the state rate commissions in support of their claims.