Timothy A. PATRICK, M.D.,
Plaintiff-Appellee,

v.

William M. BURGET, M.D., Jorma M. Leinassar, M.D., R.G. Kettlekamp, M.D., Patrick Meyer, M.D., Gary Boelling, M.D., Robert D. Neikes, M.D., Franklin D. Russell, M.D., Leigh C. Dolin, M.D., Richard C. Harris, M.D., Daniel M. Rappaport, M.D., and Tzu Sung Chiang, M.D. doing business as Astoria Clinic, Defendants-Appellants.

Nos. 85–3759, 85–4071.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 4, 1986.

Decided Sept. 30, 1986.

Don H. Marmaduke, Barbee B. Lyon, Tonkon, Torp, Galen, Marmaduke & Booth, Portland, Or., John A. Reuling, Jr., Asst. Atty. Gen., Salem, Or., for plaintiff-appellee.

Thomas M. Triplett, Schwabe, Williamson, Wyatt, Moore & Roberts, Rick T. Haselton, Lindsay, Hart, Neil & Weigler, Portland, Or., for defendants-appellants.

Herbert H. Anderson, Theodore C. Falk, Spears, Lubersky, Campbell, Bledsoe, Anderson & Young, Portland, Or., for amicus curiae Oregon Ass'n of Hospitals.

Dave Frohnmayer, Atty. Gen., James E. Mountain, Jr., Sol. Gen., John A. Reuling, Jr., Asst. Atty. Gen., Salem, Or., for amicus curiae State of Or.

Douglas R. Carlson, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for amicus curiae Joint Commission on Accreditation of Hospitals, The American Medical Ass'n and The Oregon Medical Ass'n.

Before FLETCHER, ALARCON and WIGGINS, Circuit Judges.

FLETCHER, Circuit Judge:

Appellants, partners in the Astoria Clinic, a medical clinic, appeal from a jury verdict in favor of Dr. Timothy Patrick, a surgeon in Astoria, for violations of Sherman Act sections 1 and 2 and for interference with prospective economic advantage under Oregon law. Because the conduct at the heart of the antitrust claims is exempt from liability under the state action doctrine, we reverse the judgment on the Sher-

man Act claims. Because the trial court failed to instruct the jury properly as to applicable statutory immunities, we reverse the judgment on the state law claims as well. We remand to the district court for determination of whether Patrick has antitrust claims that survive and for a new trial on the state law claim.

## BACKGROUND [1]

Astoria is a city of 10,000 people located in the northwest corner of Oregon. The only hospital in Astoria is Columbia Memorial. Columbia Memorial is a secondary hospital capable of handling some, but not all, forms of complex surgery.[2] The nearest hospital, Ocean Beach Hospital in Ilwaco, Washington, is a primary care hospital. During the relevant time frame, a majority of the Columbia Memorial medical staff were employees or partners of the Astoria Clinic.

Appellee Timothy Patrick is trained in general and vascular (blood vessel) surgery. In 1972, he joined the Astoria Clinic. After his initial one-year contract expired, he was asked to become a partner. Because he felt he had not been paid in proportion to the income he had produced for the Clinic, he chose to open an independent practice in Astoria. James Weber is a general surgeon who came to Astoria as an employee of Patrick in 1979. Patrick fired him in 1981 and Weber, in turn, set up an independent practice in Astoria.

Appellants William Burget, Jorma Leinasser, Richard Kettlekamp, Patrick Meyer, Gary Boelling, Robert Niekes, Franklin Russell, Leigh Dolin, Richard Harris and Daniel Rappaport were all partners in the Astoria Clinic when this suit was filed in 1981. Appellant Tzu Sung Chiang was added to the suit when he became a partner in 1982.[3]

From the outset the doctors in the Clinic reacted negatively to Patrick's establishment of an independent practice. Patrick received virtually no surgical referrals from the Clinic. During a period when there was no general surgeon at the Clinic, patients were referred to hospitals 50 or more miles away for surgery. If Patrick (or Weber, when he was associated with Patrick) treated a "Clinic patient," the Clinic doctors would react angrily. The record contains several examples of confrontations resulting from the perceived theft of patients. Some of these took place in front of the patients themselves. The Clinic doctors also were not interested in helping Patrick with his own patients. Clinic surgeons consistently refused to enter into cross-coverage agreements with Patrick that would provide care for each other's patients if one of them needed to be out of town. Clinic doctors also were reluctant to give consultations. At the same time, the Clinic doctors repeatedly criticized Patrick for failure to get outside consultations and adequate back-up coverage.

The pattern of treatment of emergency room patients suggested that the Clinic doctors were attempting to make Patrick's patients their own and to prevent new ones from seeing him. Witnesses testified that they had come to the emergency room, asked for Dr. Patrick, and were told he was not available. Later, they discovered that Patrick was available and that no attempt had been made to contact him. Emergency room patients without a regular doctor tended to be treated by Astoria Clinic doctors rather than Patrick or Weber. During the period when the Clinic had no general surgeon, surgical emergencies were often sent to out of town hospitals rather than to Patrick.

The Clinic doctors explained that their reluctance to deal with Patrick was due to his contentiousness and lack of skill. How-

---

**1.** We present the evidence in the light most favorable to Patrick.

**2.** Hospitals are classed as primary, secondary and tertiary in increasing order of sophistication.

**3.** The only other partner at the time the suit was filed, Leroy Steinmann, was originally named as a defendant, but was dismissed at the close of Patrick's case at trial.

ever, there was uncontroverted testimony that Patrick never had any trouble getting along with the doctors at Ocean Beach and that he had been offered a partnership in the Astoria Clinic. There also was a great deal of testimony that Patrick was quite a good surgeon.

In the fall of 1979, after Weber had joined Patrick, the difficult relations between Patrick and the Clinic doctors erupted into more serious confrontations. The Clinic doctors attacked Weber in various ways soon after his arrival, and they increased their hostility toward Patrick. However, as soon as Weber left Patrick's employ, he was invited to join the Clinic.

An incident that triggered disciplinary action against Patrick occurred shortly after Weber's arrival. Patrick operated on a Mr. Willie to repair injuries suffered in an accident. Patrick almost immediately left town for the weekend. He left Weber in charge, even though Weber was scheduled to leave for Chicago Sunday morning. Patrick told Weber to check in on Willie early Sunday and, if he looked fine, to ask Dr. Linehan, a general practitioner, to cover until Patrick's anticipated return Sunday afternoon. Weber checked on Willie at 5:00 a.m., and, finding him stable, left for Chicago.

Before Patrick returned, Willie's condition worsened. The nurses called Dr. Linehan, who did not feel competent to handle the problems that had arisen. Without calling Patrick, who was only 90 minutes away by car, Linehan asked Dr. Boelling for help. Boelling refused, saying that he had bailed Patrick out enough. The hospital chief of staff then assigned Dr. Harris, a Clinic surgeon, to the case. Patrick would have returned immediately had he been called.

Boelling wrote a letter complaining about Weber's handling of the case. The hospital staff executive committee decided to refer the Willie matter to the Oregon Board of Medical Examiners (BOME) along with charts from 14 other cases ostensibly handled by Patrick. At the time the executive committee sent the charts, the three-member investigative committee of the BOME was chaired by Dr. Russell of the Astoria Clinic. Drs. Boelling and Harris testified at the request of the investigative committee.

When Patrick and Weber met with the investigative committee, they were assured that the Willie case was the only case of Patrick's under review. Russell told them he would not participate in discussion of the case because of a "conflict" between them and his "group." However, the chairman of the BOME, Dr. Tanaka, was never informed of the conflict of interest, and Russell proceeded to brief the whole Board on Patrick's cases. Patrick and Weber then spoke with the full Board; again, only the Willie case was discussed.

The BOME voted to issue a reprimand letter. Russell was asked to draft it. The Board issued Russell's draft, with some changes made by the BOME administrator. The letter stated that it was based on the evaluation of fifteen charts; it criticized Patrick's handling of the Willie case, and noted that Patrick was careless in his medical practices generally. After receiving the letter, Patrick wrote to the BOME requesting a review of the proceedings. Over Russell's objection, the BOME sent Patrick a list of the 14 other charts that had been reviewed. Patrick had not been the treating doctor in some of the cases. He again wrote to the BOME, threatening legal action unless a new hearing was granted or the letter withdrawn. Again over Russell's objection, Tanaka agreed to meet with Patrick.

At the meeting, Patrick acknowledged that the BOME's criticism of the Willie matter was justified. After discussion of the other charts, Tanaka agreed the letter overstated matters. However, the BOME did not retract or amend the letter after Russell indicated that he knew of other cases of Patrick's that would justify the criticism. After Patrick filed a petition for judicial review, the BOME retracted the letter entirely.

In the peer review proceedings within the hospital, Patrick's cases were reviewed

by Clinic doctors, were discussed more often and criticized more thoroughly than those of other surgeons. For a period of several months, while Dr. Harris was Chief of Surgery, Patrick was given no cases of other doctors to review at all. He threatened to withdraw from the peer review process completely unless it was administered fairly. A rotating system of review was established and, subsequently, there were fewer problems. However, Patrick put forth numerous examples at trial to demonstrate that cases of other doctors similar to those that got him into serious trouble went unreviewed by the hospital's processes.[4] Harris, in particular, seems to have been free from scrutiny.

In 1981, at Harris's urging, the medical staff began proceedings to terminate Patrick's privileges at the hospital. The executive committee voted to recommend termination of privileges because Patrick's care of his patients was below the standards of the hospital. Patrick was allowed a hearing at which the executive committee presented the case against him, and he presented a defense. The charges against Patrick were drawn up at a meeting at the Astoria Clinic board room attended by the hospital administrator, an attorney appointed by the hospital to represent the executive committee, Drs. Kettlekamp and Harris. The charges originally encompassed 21 cases, some of which were not Patrick's. The nine cases that eventually comprised the evidence against Patrick were selected from a period in which Patrick had performed 2000–2500 surgeries. Of the nine, two were performed while Patrick was still at the Astoria Clinic. The experts at trial disagreed as to the magnitude of Patrick's errors in the nine cases. The jury easily

could have concluded that the mishaps in the cases did not justify termination of privileges.

Dr. Boelling chaired the ad hoc committee that heard the charges and the defense. Boelling agreed to serve as chairman despite the fact that he had testified to the BOME against Patrick about some of the cases that were before the committee. Patrick did not learn of this conflict of interest until several months after the proceedings were initiated.

At the hearings, Patrick attempted to show that the peer review process had treated his cases differently from analogous cases of other doctors. The committee was inattentive during his presentation. Patrick's counsel asked the doctors on the committee to testify as to their personal knowledge of the cases discussed as part of the defense and as to their personal biases against Patrick. The committee members refused. Patrick, convinced that the outcome was preordained, and reluctant to allow the revocation of hospital privileges to appear on his record, resigned from the hospital. He then applied for, and was granted, staff privileges at Ocean Beach Hospital.

Patrick filed this suit in early 1981 before the proceedings to terminate his hospital privileges were concluded. He alleged violations of sections 1 and 2 of the Sherman Act and interference with prospective economic advantage under Oregon law. Trial commenced December 3, 1984. The jury returned a verdict against Drs. Russell, Boelling and Harris on the section 1 count, against "The Astoria Clinic" on the section 2 count, and awarded Patrick $650,-

---

4. The most serious evidence of unequal treatment involved a Dr. McLaughlin, an alcoholic. In his early years in Astoria, there were times he could not be reached when he had been drinking. In 1978, while employed by Dr. Foster, a non-Clinic doctor, McLaughlin had some sort of breakdown during an operation and could not proceed. The hospital chiefs of staff and of surgery told Foster that subsequently he would have to chaperone McLaughlin whenever he operated. Foster fired McLaughlin, who then set up independent offices in the Astoria

Clinic building. Although he began attending Alcoholics Anonymous meetings after his breakdown, he subsequently appeared in the emergency room intoxicated. He did not report himself to the BOME as an impaired physician until he had been attending AA meetings for two years. None of the behavior was ever the subject of peer review proceedings. After he moved to the Clinic building, McLaughlin received the bulk of the orthopedic referrals from the Clinic doctors and was elected Chief of Staff of the hospital.

000 for the antitrust violations, which the court trebled. The jury also awarded $20,000 in compensatory and $90,000 in punitive damages against Boelling, Russell and Harris on the state law claim. The court awarded Patrick $228,600 in attorney's fees. The Clinic doctors timely appeal.

## DISCUSSION

### I. Antitrust Claims

■ Appellants claim that their peer review activities at the hospital and in the BOME were mandated by statute and are exempt from federal antitrust liability under the state action doctrine. The doctrine exempts from the antitrust laws actions by the state such as passage of laws by the legislature or promulgation of rules by the state Supreme Court acting in its legislative capacity. *Hoover v. Ronwin,* 466 U.S. 558, 567–68, 104 S.Ct. 1989, 1994–95, 80 L.Ed.2d 590 (1984). The doctrine is grounded in the history or language of the Sherman Act, neither of which suggests that the Act was intended as a limit on the actions of a state. *See Parker v. Brown,* 317 U.S. 341, 350–51, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943).

■ When the challenged activity is not undertaken directly by the legislature or Supreme Court, but rather is carried out by others pursuant to state authorization, "closer analysis" is required. *Hoover,* 466 U.S. at 568, 104 S.Ct. at 1995. "In such cases, it becomes important to assure that the anticompetitive conduct of the state's representative was contemplated by the state." *Id.* To acquire antitrust immunity, such conduct must be taken pursuant to a clearly articulated and affirmatively expressed state policy and must be subject to active supervision by the state. *Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 105 S.Ct. 1721, 1727, 85 L.Ed.2d 36 (1985); *see Hoover,* 466 U.S. at 569, 104 S.Ct. at 1995; *Llewellyn v. Crothers,* 765 F.2d 769, 773 (9th Cir.1985).

■ To demonstrate "clear articulation," the defendants need not point to specific authority for anticompetitive activity; it is enough that they show that the legislature contemplated the kind of activity complained of. *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 1719, 85 L.Ed.2d 24 (1985). *See Benson v. Arizona State Board of Dental Examiners,* 673 F.2d 272, 276 n. 8 (9th Cir.1982). That is, it must be clear that the legislature intended to replace competition with regulation in the relevant market. *Southern Motor Carriers,* 105 S.Ct. at 1731.

■ Oregon's statutory scheme demonstrates such an intent. Oregon requires that its health care facilities be licensed. Or.Rev.Stat. § 441.015(1). To maintain the license, the governing board of each facility must insure that procedures exist for granting or restricting privileges of the medical staff and that the medical staff is organized in such a manner as effectively to review one another's professional practices at the facility to reduce morbidity and mortality and to improve patient care. Or. Rev.Stat. §§ 441.030, 441.055(3)(c) & (d). Under the Oregon scheme,[5] consumers are not given unlimited choice as to the physicians they prefer; the hospitals can restrict patients' access to doctors whose performances are determined to be substandard. Moreover, the scheme mandates that other doctors take an active part in the regulation. Thus, peer review constitutes regulation by competitors, especially in a small community such as Astoria or in a very specialized field. *See Marrese v. Interequal, Inc.,* 748 F.2d 373, 388 (7th Cir.1984), *cert. denied,* ── U.S. ──, 105 S.Ct. 3501, 87 L.Ed.2d 632 (1985). Compulsion is the best evidence of a state policy. *Southern Motor Carriers,* 105 S.Ct. at 1729; *see Town of Hallie,* 105 S.Ct. at 1720. Oregon, by compelling physicians to review their competitors, affirmatively has expressed a

5. It is undisputed that the peer review structure at Columbia Memorial was established pursuant to this statutory scheme.

policy to replace pure competition with some regulation.[6]

■■■■ The peer review process is supervised actively by the state. To maintain licenses, health care facilities regularly must review privilege termination and restriction procedures to assure their conformity to applicable law. Or.Rev.Stat. § 441.030, 441.055(3)(c). When a health care facility terminates or restricts the privileges of a physician, it must promptly report to the BOME all facts and circumstances that caused the termination or restraint. Or.Rev.Stat. § 441.820(1). Supervision by the Board, a state agency, is equivalent to supervision by the state. *Benson,* 673 F.2d at 278. The hospital's decisions terminating or restricting privileges are also judicially reviewable. Oregon courts have reviewed adverse privilege decisions to determine if they were made in good faith pursuant to fair procedures and were supported by the facts. *See Straube v. Emanuel Lutheran Charity Board,* 287 Or. 375, 600 P.2d 381, 386–87 (1979), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1657, 64 L.Ed.2d 242 (1980); *Huffaker v. Bailey,* 273 Or. 273, 540 P.2d 1398, 1401 (1975); *see also* Or.Rev.Stat. 41.675(5) (rule that peer review proceedings confidential inapplicable in judicial proceedings challenging adverse privilege decision). The combination of internal review by the hospitals, review by the BOME, and review by the courts constitutes adequate supervision. *See Tambone v. Memorial Hospital,* 635 F.Supp. 508, 514–15 (N.D.Ill.1986) (no state supervision where records of peer review *not* automatically transmitted to state agencies); *see also Hoover,* 466 U.S. at 572 n. 22, 104 S.Ct. at 1997 n. 22 (availability of judicial review evidence of state action); *cf. California Liquor Dealers Assn. v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105–06, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) (no supervision of state authorized resale price maintenance where no review of reasonableness of price schedules, no monitoring

of market conditions or "pointed reexamination" of the program).

The Seventh Circuit, addressing Indiana's scheme, which is nearly identical to Oregon's, has concluded that peer review is exempt from antitrust liability. *Marrese v. Interqual, Inc.,* 748 F.2d 373 (7th Cir.1984). The court in *Marrese* stated that given the state statutory scheme, "it runs contrary to the very concepts of state sovereignty and federalism for a federal court to review the conduct of a peer review committee, under the guise of the Sherman Act...." *Id.* at 395.

Patrick points out that a recent district court case, *Quinn v. Kent General Hospital, Inc.,* 617 F.Supp. 1226 (D.Del.1985) disagrees with the result reached by *Marrese. See* 617 F.Supp. at 1238–39. The *Quinn* court found that peer review proceedings, properly applied, do not restrict competition and concluded that the state had not intended to replace competition with regulation by mandating peer review. *Id.* at 1239 & n. 10. We disagree. The peer review process allows doctors to agree to eliminate a competitor from the market because they believe his or her product is substandard. An analogous scheme would allow General Motors, Chrysler and Ford to review the safety of Toyotas to determine if the public should be allowed to drive them. Clearly such an arrangement would raise antitrust concerns. The fact that the state's regulations may be wise and in the best interest of consumers does not alter the fact that the regulations limit free competition. *See FTC v. Indiana Federation of Dentists,* —— U.S. ——, 106 S.Ct. 2009, 2020, 90 L.Ed.2d 445 (1986).

■■■■ Dr. Russell's activities as a member of the BOME also are exempt from antitrust liability under the state action doctrine. Patrick complains about Russell's actions taken as part of the BOME's consideration of complaints against medical practitioners (Patrick and Weber). Russell gave the Board informa-

---

**6.** Oregon also provides good faith immunity to the participants in the peer review process. Or. Rev.Stat. § 41.675(4). One court has held that

such immunity alone demonstrates clear articulation. *See Tambone v. Memorial Hospital,* 635 F.Supp. 508, 513 (N.D.Ill.1986).

tion about the practitioners, participated in discussion of the case, and drafted a reprimand letter. The BOME is the state agency authorized by the legislature to receive such complaints and to investigate and act on them. Or.Rev.Stat. §§ 677.265, 677.415. Actions within the scope of a state official's authority, taken pursuant to express state policy, which are contemplated by the statutory scheme, are actions of the state and therefore immune. *See Llewellyn*, 765 F.2d at 774–75; *see also Southern Motor Carriers*, 105 S. Ct. at 1730 (immunity available when state agency's activity taken pursuant to policy approved by state legislature). Russell's activities meet this test.

■ There was substantial evidence that the defendants acted in bad faith in the hospital's peer review process and in the BOME proceedings. Patrick argues that the state action doctrine does not immunize bad faith conduct. This argument misconstrues the nature of the doctrine. Once we have determined that a state has acted to replace competition with regulation in a given market, out of respect for the sovereignty of the state, federal antitrust laws simply are displaced. *See Hoover*, 466 U.S. at 574, 104 S.Ct. at 1998. The subjective motivations of the individual actors are irrelevant. *Llewellyn*, 765 F.2d at 774; *see Hoover*, 466 U.S. at 581 n. 34, 104 S.Ct. at 2002 n. 34. Actions otherwise immune do not "forfeit that protection merely because the state's attempted exercise of its own power is imperfect in execution under its own law." *Llewellyn*, 765 F.2d at 774; *see Hoover*, 466 U.S. at 572 n. 22, 104 S.Ct. at 1997 n. 22. (whether state committee followed applicable state Supreme Court rules irrelevant to applicability of the doctrine); *Sonitrol of Fresno, Inc. v. American Telephone & Telegraph Co.*, 629 F.Supp. 1089, 1097–1100 (D.D.C. 1986) (state action doctrine applies to acts of ratesetting agency despite tactics of de-

ception and misrepresentation of phone companies seeking rate increases). Whether state agents or others acting pursuant to state authorization have acted in bad faith is generally a question for the state courts. *See id.* (quoting Areeda, *Antitrust Immunity for "State Action" After Lafayette*, 95 Harv.L.Rev. 435, 453 (1981)). "A contrary conclusion would compel the federal courts to intrude upon internal state affairs whenever a plaintiff could present colorable allegations of bad faith on the part of defendants." *Id.*

■ Patrick cites the statute that immunizes good faith peer review activity to demonstrate that Oregon has authorized only good faith conduct. *See* Or.Rev.Stat. § 41.675(4). However, we doubt that a state ever authorizes bad faith actions as such, any more than it authorizes errors of fact or law or procedural irregularities. *See Llewellyn*, 765 F.2d at 774; Areeda, 95 Harv.L.Rev. at 450. The fact that Oregon only immunizes good faith conduct demonstrates that Patrick had a state law remedy for any actions taken against him in bad faith,[7] but does not alter the basic fact that the actions challenged in this case were those of the state. *See generally Marrese*, 748 F.2d at 932 (applying state action doctrine despite similar good faith immunity statute).

■ Because much of the evidence presented in this case related to actions exempt under the state action doctrine, we reverse the judgment on the antitrust claims and remand to the district court to determine if Patrick has actionable antitrust claims remaining based on conduct other than the peer review process.[8]

## II. State Law Claim

■ Appellants argue that we must reverse the judgment on the state law claim because the district court failed to instruct the jury correctly as to various

---

7. We do not decide whether Patrick may have waived any state law remedies by resigning rather than completing the review process and appealing to the Oregon courts.

8. Because attorney's fees were awarded to Patrick as prevailing party in an antitrust action, *see* 15 U.S.C. § 15 (1982), we also reverse the grant of fees.

state law immunities.[9] Dr. Russell, as a member of BOME, is entitled to the same immunity that a judge would receive. Or. Rev.Stat. § 677.335(1). Under Oregon law, judges are immune from personal liability for acts taken in the performance of judicial business unless jurisdiction for their actions is clearly absent.[10] *Utley v. City of Independence*, 240 Or. 384, 402 P.2d 91, 92–93 (1965); *Quast v. City of Ontario*, 43 Or.App. 557, 603 P.2d 1210, 1210–11 (1979); *see Higgins v. Redding*, 34 Or.App. 1029, 580 P.2d 580 (1978). Immunity applies even if the judge's jurisdiction is questionable. *Utley*, 402 P.2d at 92. Dr. Russell's activities as a member of BOME therefore were immune unless jurisdiction was clearly absent. As we have noted, all the actions complained of fell within the scope of his statutory duties and involved questions well within the jurisdiction of the BOME. Thus, the trial court erred by failing to give the requested instruction to the effect that actions undertaken as a member of BOME are immune from state law liability.

■■■■ Witnesses before the BOME are immune from civil liability under Oregon law for their testimony unless they commit perjury. Or.Rev.Stat. § 677.335(2). The trial court erred in not giving an instruction to reflect that immunity as applied to Drs. Boelling and Harris. Finally, doctors who serve on or communicate information to hospital committees or governing bodies have good faith immunity from civil liability. Or.Rev.Stat. § 41.675(4). The jury was told that the defendants were immune from liability for good faith activities taken before, or as members of the ad hoc committee.[11] However, every action on or before any of the numerous committees mentioned in this case was entitled to good faith immunity. The trial court erred in failing to give defendants' requested instruction making that clear.[12]

■■■■ To require reversal, error in a civil case must more probably than not have affected the verdict. *Haddad v. Lockheed California Corp.*, 720 F.2d 1454, 1459 (9th Cir.1983). The judgment against Dr. Russell must be reversed. The most damning evidence against him was the evidence of his duplicity at the BOME; the fact that this conduct was immunized would likely have affected the jury's decision. The case for reversing the judgments against Drs. Harris and Boelling is closer. The jury, by awarding punitive damages against them, found that some of their conduct amounted to "deliberate disregard for the rights of others or reckless indifference to such rights." We believe this equates to a finding of bad faith. Thus, it is unclear how much significance should be attached to the absence of a good faith immunity instruction. However, the court instructed the jury on several theories that might result in liability of the

**9.** Patrick contends that appellants did not adequately object to the failure to give their instructions, and so these complaints are not properly before this court. However, the trial court granted continuing objections to instructions not given. Where a trial court is aware of a party's position on any issue and refuses to give an instruction, no further objection is necessary to preserve it for appeal. *See Brown v. Avemco Investment Co.*, 603 F.2d 1367, 1371 (9th Cir. 1979). In this case, the court was aware of the Clinic doctors' position on immunities (the arguments were made in the pretrial brief and in support of motions for directed verdicts), and so the issues are properly before us.

**10.** Patrick argues that judicial immunity standards from federal civil rights cases should govern. *See, e.g., Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). However, the issue is to what extent *Oregon* has immun-

ized its judges. Oregon's judicial immunity may be different from federal judicial immunity. *See O'Neil v. City of Lake Oswego*, 642 F.2d 367, 368 n. 1 (9th Cir.1981).

**11.** The court presumably referred to the committee that heard Patrick's defense of his privileges; there were several ad hoc committees mentioned at trial.

**12.** We recognize that we must look at the jury instructions as a whole to determine whether they were adequate. *See Los Angeles Memorial Coliseum Commission v. National Football League*, 726 F.2d 1381, 1398 (9th Cir.), *cert. denied*, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984). The instructions as a whole did not give any indication that defendants' conduct (other than that involving the one ad hoc committee) might be immune.

defendants,[13] making it impossible to say which theory or theories the jury adopted. Moreover, since the verdict form did not require the jury to allocate responsibility for damages to particular defendants or particular conduct, we cannot tell whether or to what extent the jury was influenced by Russell's immunized conduct in arriving at its damage figures. The jury was not properly instructed on immunity: to wit, that Boelling and Harris were immune from liability for their testimony before the BOME; that all defendants had qualified immunity as to their conduct pertaining to the various hospital committees; and that Russell had absolute immunity for his conduct as chairman of BOME. Proper instruction with respect to the various immunities would more likely than not have changed either the determination of liability or of damages as to Boelling and Harris. Thus, we reverse the judgments against all three defendants on the state law claim and remand for a new trial.

## CONCLUSION

On remand, the district court must determine whether sufficient evidence remains in the case to permit retrial of the antitrust claims. There is no doubt that the evidence, viewed in the light most favorable to Patrick, reveals shabby, unprincipled and unprofessional conduct on the part of the defendants. However, the State of Oregon regulates its health care industry through mandatory peer review and thereby immunizes much of the conduct complained of. The state action doctrine limits Patrick's remedy under the antitrust laws. It does not preclude antitrust liability for anticompetitive conduct outside the peer review process, nor does it preclude resort to state law claims or remedies available in state court.

REVERSED and REMANDED.

**13.** The court outlined five theories by which the defendants could be liable: refusing to call Patrick when emergency room patients asked for him; failing to refer prospective patients to him; refusing to continue treatment of patients who requested Patrick's surgical services; general interference with Patrick's relationships with individual patients; and causing the loss of his staff privileges.