CITY COMMUNICATIONS, INC., a Michigan corporation, Plaintiff,

v.

CITY OF DETROIT, a Municipal corporation, Barden Cablevision of Detroit, Inc., a Michigan corporation, and Maclean-Hunter, a Canadian corporation, Defendants.

No. 86–CV–71087–DT.

United States District Court, E.D. Michigan, S.D.

Jan. 22, 1987.

Schnader, Harrison, Segal & Lewis by Peter S. Greenberg, Lois W. Davis, Philadelphia, Pa., Butzel Long Gust Klein & Van Zile by William M. Saxton, Edward M. Kronk, Detroit, Mich., for plaintiff; Hyde & Mercer, William R. Hyde, Jr., Washington, D.C., of counsel.

Dickinson Wright Van Dusen & Freeman by Fred W. Freeman, W. Gerald Warren, Roger H. Cummings, Elizabeth A. Trickey, Detroit, Mich., for defendant Barden Cablevision of Detroit, Inc.

Honigman Miller Schwartz and Cohn by David A. Ettinger, I.W. Winsten, H.C. Goplerud, William D. Sargent, Detroit, Mich., for defendant City of Detroit.

William J. DeBiasi, P.C. by William J. DeBiasi, Taylor, Mich., for defendant MacLean-Hunter Cable TV, Inc. Incorrectly denominated as MacLean-Hunter.

## OPINION

GILMORE, District Judge.

This matter is before the Court upon defendants' motions to dismiss, or for summary judgment. The suit challenges the legality of the City of Detroit's award to defendants of an exclusive cable television franchise for the City of Detroit.

Plaintiff is one of two unsuccessful bidders for the contract to install cable television in the City of Detroit, and has filed this six count complaint seeking compensatory damages of at least $50,000,000, treble damages for antitrust violations, punitive damages, and also an injunction to prevent the installation of defendants' cable system.

Counts I, II and III allege violations of Sections One and Two of the Sherman Act, claiming the defendants conspired to violate the antitrust law. Count IV alleges due process violations by the City in the selection process. Count V alleges a First Amendment violation by the City in awarding only one city-wide cable TV franchise, and Count VI alleges waste of public property.

In April 1981, the Common Council of the City of Detroit passed certain ordinances aimed at the establishment of a cable television system for the City. One ordinance established The Detroit Cable Communications Commission to review all applications and recommend a franchisee to the Mayor.

Subsequently, in August of 1982 the City issued a request for proposals to provide cable television services for the City of Detroit.

Three bidders submitted applications in response to the request for proposals—plaintiff City Communications, Inc. ("City Communications"), defendant Barden Cablevision of Detroit, Inc., ("Barden"), and Detroit Inner-Unity Bell Cable System ("DIUB"). Each bid was accompanied by a payment of $10,000. According to the allegations of the complaint, which must be taken as true for the purposes of this motion, plaintiff's proposal met the requirements set out in the request for proposals, while defendants' proposals failed to meet the requirement of adequate financial backing. Nevertheless, in July of 1983 the City awarded the franchise to Barden. The franchise was to commence on August 31, 1983 and continue until August 31, 1998, unless terminated or forfeited by the City. It was conditioned upon Barden demonstrating an unconditional financial commitment for constructing and operating the cable system, and executing a franchise agreement with the City on or before August 31, 1984.

On July 26, 1983, plaintiff filed suit against the City and Barden in Wayne County Circuit Court seeking to block the award of the franchise to Barden, alleging breach of contract and promissory estoppel.[1] Wayne County Circuit Judge Maureen P. Reilly dismissed the action in November 1983 on the grounds that, under Michigan law, a disappointed bidder lacked standing to challenge the award of a public

---

1. *City Communications, Inc. v. City of Detroit and Barden Cablevision of Detroit, Inc.,* No. 83- 3229792–CZ, Order of Dismissal (Wayne Circuit Court November 2, 1983).

contract.[2] Also in July 1983, the other unsuccessful bidder, DIUB, filed an action in United States District Court raising antitrust, constitutional, and state law claims. On August 18, 1983, Judge Guy denied an injunction in that matter on the grounds that discovery had revealed no evidence of conspiracy. The case was later dismissed with prejudice by stipulation on January 17, 1984.

In August of 1984, Barden notified the City that it could not meet the August 31 deadline for executing the cable franchise. The City agreed to extend the deadline from August 31, 1984 to September 30, 1984, so that the Cable Commission could hold public hearings and evaluate Barden's requested modification. The Commission initially recommended that Barden's franchise be terminated. Before the city could act on the Commission's recommendation, Congress passed the Cable Communications Policy Act of 1984, 47 U.S.C. § 521 *et seq.* The Commission therefore took its recommendation of termination under reconsideration, and ultimately retracted it on October 29, 1984. The City granted Barden additional time to firm up its financing.

Barden requested additional significant modifications in 1985, and in May and December of that year the City agreed to allow Barden to make such modifications. These included elimination of a promised third cable system, elimination of $38,000,-000 in proposed grants to the City, reduction of the number of channels in the system from 112 to 78, an increase in the construction time by three years, to five and a half years, elimination of other technical matters, addition of defendant Maclean Hunter for a 40 per cent or greater ownership interest, and reduction by approximately 33 per cent of plaintiff's construction expenditures for the system.

### I

The first issue is whether the City and the private defendants fall under the "state action" exemption from antitrust liability. This doctrine was established in 1943 in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In that case, a raisin producer filed an action against the California Director of Agriculture challenging the state's establishment of a cartel of private raisin producers. The Court upheld the California law against the antitrust challenge, recognizing that the state's program was anticompetitive, but holding that the Sherman Act was not intended to prevent the states from imposing restraints on competition:

> The state in adopting and enforcing the prorate program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit.

*Id.* at 352, 63 S.Ct. at 314.

In *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), the Court clarified the application of the state action exemption to municipalities. In *Hallie,* a group of unincorporated Wisconsin townships alleged that the City of Eau Claire had violated the Sherman Act by acquiring a monopoly over sewage treatment in the area, and by providing sewage treatment only to areas that were willing to be annexed by the city and use its sewage collection services. The Supreme Court held that anticompetitive conduct by a municipality is protected by the state action exemption to the Federal antitrust laws where the city's actions are authorized by state law, even though the state does not compel or actively supervise the anticompetitive conduct, or expressly assert that the law is intended to have an anticompetitive effect. The municipality need only prove that the actions were pursuant to a clearly articulated and affirmatively expressed state policy. The Court said:

> In *Parker,* relying on principles of federalism and state sovereignty, the Court refused to construe the Sherman Act as

---

**2.** This determination was affirmed by the Michigan Court of Appeals on March 25, 1985 in *City*

*Communications Inc. v. City of Detroit and Barden Cablevision of Detroit,* No. 74988.

applying to the anticompetitive conduct of a State acting through its legislature.... Rather, it ruled that the Sherman Act was intended to prohibit private restraints on trade, and it refused to infer an intent to "mullify a state's control over its officers and agents" in activities directed by the legislature.

. . . . .

Municipalities, on the other hand, are not beyond the reach of the antitrust laws by virtue of their status because they are not themselves sovereign. *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 412 [98 S.Ct. 1123, 1136, 55 L.Ed.2d 364] (1978) (opinion of Brennan, J.). Rather, to obtain exemption, municipalities must demonstrate that their anticompetitive activities were authorized by the State "pursuant to state policy to displace competition with regulation or monopoly public service." ...

The determination that a municipality's activities constitute state action is not a purely formalistic inquiry; the State may not validate a municipality's anticompetitive conduct simply by declaring it to be lawful.... On the other hand, in proving that a state policy to displace competition exists, the municipality need not "be able to point to a specific, detailed legislative authorization" in order to assert a successful *Parker* defense to an antitrust suit.... Rather, *Lafayette* suggested, without deciding the issue, that it would be sufficient to obtain *Parker* immunity for a municipality to show that it acted pursuant to a "clearly articulated and affirmatively expressed ... state policy" that was "actively supervised" by the state....

. . . . .

It is therefore clear from our cases that before a municipality will be entitled to the protection of the state action exemption from the antitrust laws, it must demonstrate that it is engaging in the challenged activity pursuant to a clearly expressed state policy.

471 U.S. 34 at 38, 105 S.Ct. 1713 at 1716.

In *Hallie*, the Court found a sufficiently clear articulation of state authority to dis-

place competition with local regulation in the language of the state's enabling legislation for local sewage systems. The legislation specifically allowed cities to refuse to provide sewer service to unincorporated areas. Thus, the Court held that the state action exemption applied to the City of Eau Claire even though the statute did not expressly say that it authorized anticompetitive conduct, since such conduct is a foreseeable result of giving the city power to refuse to serve unannexed areas.

Additional clarification of the doctrine has come from the Sixth Circuit in *Riverview Investments v. Ottawa Community Improvement Corp.*, 769 F.2d 324 (1985), *modified*, 774 F.2d 162 (1985). There, the plaintiff alleged that private defendants conspired to bring about the denial of its application for industrial revenue bonds. Discussing *Hallie, supra,* and *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985), the Court said:

> Two recent Supreme Court cases reaffirm a two-pronged test for determining when a defendant's conduct is eligible for "state action" exemption. The first prong requires that the anticompetitive behavior derive from a clearly articulated state policy; the second prong requires active supervision of the anticompetitive behavior, but only when the actor is a *private* party rather than a municipality, a modification or clarification of previous law....

769 F.2d 324 at 329.

The Sixth Circuit held that the statute granting cities authority to issue such bonds met the *Hallie* test "because decisions increasing or restricting competition, though not explicitly stated or recognized in the Ohio statute, are a logical and necessary outcome of the authority to grant industrial revenue bonds for the purpose of protecting jobs." *Id.*

Defendants argue that, under *Hallie*, the state action exemption relieves the City of Detroit of antitrust liability in the case at bar because the Michigan Constitution au-

thorizes the City to grant cable television franchises.

Article VII, Section 29, of the Michigan Constitution of 1963 provides:

No person, partnership, association or corporation, public or private, operating a public utility shall have the right to the use of the highways, streets, alleys or other public places of any county, township, city or village for wires, poles, pipes, tracks, conduits or other utility facilities, without the consent of the duly constituted authority of the county, township, city or village; or to transact local business therein without first obtaining a franchise from the township, city or village. Except as otherwise provided in this constitution the right of all counties, townships, cities and villages to the reasonable control of their highways, streets, alleys and public places is hereby reserved to such local units of government.

The Court agrees with defendants that the Michigan Constitution expresses a state policy to allow municipalities to grant or withhold franchises, and that this policy has the foreseeable potential of authorizing a refusal to deal that could have anticompetitive results.

Plaintiff argues that this case is more closely analogous to *Community Communications Co., Inc. v. City of Boulder, Colorado,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). In that case, the Court held that the Colorado Constitution's Home Rule provision conferring general authority to govern local affairs on municipal governments did not constitute a sufficiently "clear articulation" of a state policy to authorize anticompetitive municipal conduct to immunize such conduct in connection with awarding of a cable TV franchise. Plaintiff cites the following passage from *City of Boulder:*

But plainly the requirement of "clear articulation and affirmative expression" is not satisfied when the State's position is one of mere *neutrality* respecting the

municipal actions challenged as anticompetitive. A State that allows its municipalities to do as they please can hardly be said to have "contemplated" the specific anticompetitive actions for which municipal liability is sought. Nor can those actions be truly described as "comprehended within the powers *granted,*" since the term "granted" necessarily implies an affirmative addressing of the subject by the State.... Acceptance of such a proposition—that the general grant of power to enact ordinances necessarily implies state authorization to enact specific anticompetitive ordinances— would wholly eviscerate the concepts of "clear articulation and affirmative expression" that our precedents require.

*Id.* at 55–56, 102 S.Ct. at 842–843.

Plaintiff argues that Article VII, Section 29 of the Michigan Constitution of 1963 is similar to the home rule provision in *City of Boulder*—a general grant of authority to regulate. They argue that applying the state action exemption in this case would stretch a general authority to regulate public utilities into a specific state authorization to engage in anticompetitive conduct. They therefore claim that the case is controlled by *City of Boulder.*

The Court disagrees. The Michigan constitutional provision is much closer to the Wisconsin statute in *Hallie* than to the general home rule amendment in *City of Boulder.* Like the enabling statute in *Hallie,* the consitutional provision specifically allows the municipality to ban all use of public facilities. Here, as in *Hallie,* anticompetitive conduct is a "foreseeable result of empowering the city to refuse to serve" those attempting to use public facilities. The home rule provisions in *City of Boulder,* by contrast, were simply general grants of local autonomy that did not express authority to replace competition with regulation in the granting of cable TV franchises. Rather, it was an expression of mere neutrality to the extent that it said anything at all on the subject.[3] This Court

---

**3.** *See also Carlson v. Village of Union City,* 601 F.Supp 801, 804–09 (W.D.Mich.1985), where

Judge Gibson, writing prior to *Hallie* and *Motor*

thus concludes that, as to the City of Detroit, *Hallie* governs, and the state action exemption applies to immunize the city from antitrust liability.

■ Plaintiff has argued that the state action exemption cannot apply in this case because the state action requirement incorporates a "rule of reason" or "good faith" requirement. Plaintiff argues that the gravamen of its complaint is that defendants conspired to continually change the rules of the franchise application process so as to accommodate Barden, and prevent plaintiff from competing fairly for a franchise. Plaintiff argues that such bad faith conduct can not have been within the contemplation of the drafters of Article VII, Section 29, of the Michigan Constitution, and that, therefore, under the cases of *Independent Taxi Cab Driver's Employees v. Greater Houston Transp. Co.*, 760 F.2d 607 (5th Cir.1985), and *Marrese v. Interequal, Inc.*, 748 F.2d 373 (7th Cir.1984), the state action exemption should not apply.

Defendants respond that the state action exemption applies even where the state's policy does not specifically contemplate bad faith actions because the motivations of state or municipal actors are irrelevant to the state action exemption analysis under *Hoover v. Ronwin*, 466 U.S. 558, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984). Defendants cite *Patrick v. Burget*, 800 F.2d 1498 (9th Cir.1986), for the proposition that, once a state has expressed a policy to replace competition with regulation in a given market, federal antitrust law is simply displaced out of respect for the sovereignty of the state.

Authority is split on whether the state action exemption incorporates a "rule of reason" or "good faith" requirement. In *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 415, 98 S.Ct. 1123, 1138, 55 L.Ed.2d 364 (1978), Justice Brennan stated that, in order for the state action exemption to apply, it must be found "from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of." The context of this

*Carriers,* construes Art. 7 § 29 as granting state

statement was not the explicit establishment of a "good faith" requirement, but rather the clarification that, in order for state action immunity to apply to a municipality, the municipality needed more than a neutral policy of the state but less than a specific and detailed state authorization of its activity.

However, some courts have relied on the above language in imposing a good faith requirement, reasoning that a state legislature could not have "contemplated" conspiratorial, deceptive or other bad faith activities of a political subdivision, and that therefore state action immunity should not apply to such actions. Such was the reasoning in *Preferred Communications, Inc. v. City of Los Angeles, California*, 754 F.2d 1396 (9th Cir.1985), *Corey v. Look*, 641 F.2d 32 (1st Cir.1981), *Whitworth v. Perkins*, 559 F.2d 378 (5th Cir.1977), and *Mason City Center Assocs. v. Mason City*, 468 F.Supp. 737 (N.D.Iowa 1979). Other courts have simply noted that the restraints in question must be "a reasonable and foreseeable exercise of delegated powers." *Hybud Equip. Corp. v. City of Akron*, 742 F.2d 949 (6th Cir.1984), *cert. denied*, 471 U.S. 1004, 105 S.Ct. 1866, 85 L.Ed.2d 160 (1985).

This line of reasoning is not without force since it is clear that the state action exemption does not apply to municipalities unless they act pursuant to a clearly expressed state policy. While the cases clearly do not require that the state policy explicitly set forth sanctioned forms of anticompetitive conduct by political subdivisions, they do require that anticompetitive conduct be a foreseeable result of the state policy. The argument that bad faith, conspiratorial or deceptive conduct by a city will never be a foreseeable result of state policy, and, therefore, should not be covered by state action immunity, does have an intuitive appeal.

However, the Court is not persuaded by this line of reasoning since it fails to take into account the rationale for the state action exemption and since it threatens to

action immunity.

completely obviate the doctrine. The origin of the state action exemption is federalism and a respect for the sovereignty of the states. *Parker, supra,* and *Hallie, supra.* Given that fact, the primary issue for the determination of whether to apply the state action doctrine is not whether the city acted properly or in good faith, but whether it acted pursuant to a clearly expressed state policy that had as a foreseeable effect some limitation on competition. As the Supreme Court said in *Hoover v. Ronwin,* 466 U.S. 558, 574, 104 S.Ct. 1989, 1998, 80 L.Ed.2d 590 (1984):

> The reason that state action is immune from Sherman Act liability is not that the State has chosen to act in an anticompetitive fashion, but that the State itself has chosen to act. "There is no suggestion of a purpose to restrain state action in the [Sherman] Act's legislative history." *Parker,* 317 U.S., at 351 [63 S.Ct., at 313]. The court did not suggest in *Parker,* nor has it suggested since, that a state action is exempt from antitrust liability only if the sovereign acted wisely after full disclosure from its subordinate officers. The only requirement is that the action be that of "the State acting as a sovereign."

Recognizing this basis in federalism, various courts have decided that, once it is determined that a state has acted to replace competition with regulation in a given market, then, out of respect for state sovereignty, federal antitrust law is simply displaced. The subjective motivations of individual actors are irrelevant, as is the presence of good or bad faith. Actions immune under the state action doctrine are held not to lose their immunity just because the state exercised its sovereignty imperfectly. Following this line of reasoning, the court in *Patrick v. Burget,* 800 F.2d 1498 (9th Cir.1986), applied the doctrine of state action immunity despite substantial evidence of bad faith actions by the defendants. Similarly, in *Llewellyn v. Crothers,* 765 F.2d 769 (9th Cir.1985), the court held the defendant immune from antitrust liability under the state action doctrine despite allegations that a bad faith motivation (dislike of chiropractors) had led him to reduce the number and types of chiropractic treatments compensable by workers compensation. In *Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220 (7th Cir.1975), the court held that the Sherman Act did not apply to otherwise valid acts that might have been influenced by unethical campaign contributions. In *Sonitrol of Fresno, Inc. v. American Tel. & Tel. Co.,* 629 F.Supp. 1089 (D.D.C.1986), the court applied state action immunity despite charges that the defendants had engaged in tactics of deceit and misrepresentation.

Not only does it follow logically that, if the foundation for immunity is federalism, the sovereignty of state action must be respected without reference to the subjective motivations of persons implementing the state's policies, it also follows as a practical matter. Any other analysis will unacceptably erode the state action doctrine since a plaintiff would only need to present some colorable claim of bad faith or motivation to escape the doctrine. As one commentator has noted:

> State laws intended to displace the antitrust laws may delegate to public agencies or officials the power to act, decide, or regulate in order to achieve anticompetitive results. Of course, state law "authorizes" only agency decisions that are substantively and procedurally correct. Errors of fact, law or judgment by the agency are not "authorized," and state tribunals will normally reverse erroneous acts or decisions. If the antitrust court demands unqualified "authority" in this sense, it will inevitably become the standard reviewer of governmental agencies whenever it is alleged that the agency, though possessing the power to engage in the challenged conduct, has exercised its power erroneously.

Areeda, *Antitrust Immunity for "State Action" after Lafayette,* 95 Harv.L.Rev. 435, 449–50 (1981).

"Ordinary" errors or abuses in the administration of powers conferred by the

state should be left for state tribunals to control.

*Id.* at 453.

As the court in *Llewellyn, supra* at 774, noted: "A contrary rule would tempt aggrieved parties to forego available state corrective processes in hopes of obtaining the treble damages remedy conferred by the Sherman Act." And as Professor Areeda has noted, vague and conclusory allegations of collusion and conspiracy, while difficult to prove, are easy to make. See also, *Hoover v. Ronwin,* 466 U.S. 558, 581 n. 34, 104 S.Ct. 1989, 2002 n. 34, 80 L.Ed.2d 590 (1984) ("Ronwin ... basically challenges the *motive* of the Arizona Committee. His claim is that the grading formula was devised for the purpose of limiting competition. If such an allegation is sufficient to survive a motion to dismiss, examining boards and committees would have to bear the substantial 'discovery and litigation burdens' attendant particularly upon refuting a charge of improper motive.").

For all the above reasons, the Court concludes that the state action doctrine applies to immunize the City of Detroit from any antitrust liability. This immunity is not destroyed by any "good faith exception" to the doctrine. Therefore, the City's motion to dismiss the antitrust claims is granted.

## II

The private defendants, however, are another matter. They argue that any decision as to the city on the state action issue must apply to the private defendants as well, since any other result would undercut the vitality of the state action doctrine. That argument flies directly in the face of Supreme Court authority on the subject. On the same day that the Court released *Hallie,* a case applying the doctrine to a municipality, the Court also decided *Southern Motor Carriers Rate Conference v. U.S.,* 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). In that case, the Court reaffirmed the two-pronged test laid down earlier in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), to determine whether private par-

ties are covered by the state action exemption:

The circumstances in which *Parker* immunity is available to private parties, and to state agencies or officials regulating the conduct of private parties, are defined most specifically by our decision in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97 [100 S.Ct. 937, 63 L.Ed.2d 233], ... In *Midcal,* we affirmed a state-court injunction prohibiting officials from enforcing a statute requiring wine producers to establish resale price schedules. We set forth a two-pronged test for determining whether state regulation of private parties is shielded from federal antitrust laws. First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy." ... Second, the State must supervise actively any private anticompetitive conduct.... This supervision requirement prevents the State from frustrating the national policy in favor of competition by casting a "gauzy cloak of state involvement" over what is essentially private anticompetitive conduct.

*Id.* at 57, 105 S.Ct. at 1727.

The same two-pronged requirement was reiterated in *Riverview Investments v. Ottawa Community Improvement Corp.,* 769 F.2d 324 (6th Cir.), *modified,* 774 F.2d 162 (6th Cir.1985).

■ Defendants argue that, since *Hallie* decided that the second prong need not be applied to municipal defendants, "active state supervision" need not be established for the private defendants either. The Court does not agree. *Midcal Aluminum* clearly requires active state supervision of private defendants, as does *Southern Motor Carriers.* Defendants' argument that any time a municipality is one of the defendants, the second prong of the *Midcal* test is waived for all of the defendants, including private defendants, must fail. Such an argument does not square with the rationale for the state supervision requirement. Further, it was expressly foreclosed in a footnote in *Hallie:* "Where state or

municipal regulation by a private party is involved, however, active state supervision must be shown, even where a clearly articulated state policy exists." 471 U.S. at 46 n. 10, 105 S.Ct. at n. 10.

■ The defendants have argued in the alternative that state supervision of a private entity can be provided by the municipality where the municipality is authorized by the state to engage in anticompetitive activity. Defendants cite *Savage v. Waste Management, Inc.*, 623 F.Supp. 1505 (D.S. C.1985), for the proposition that the second prong of the *Midcal* test for private entities can be satisfied by active supervision by the municipality. This is an attractive argument. However, it has not been expressly approved by the Supreme Court; and it has been expressly rejected by the Sixth Circuit in *Riverview Investments Inc., v. Ottawa Community Improvement Corporation*, 774 F.2d 162 (6th Cir.1985). Therefore, state action immunity can not apply in this case to relieve the private defendants of antitrust liability.

■ Furthermore, the Court rejects defendants' argument that they are entitled to implied federal statutory immunity from antitrust liability. Defendants have in no way made an adequate showing of the kind of "clear repugnacy" between the Cable Communication Policy Act of 1984 and federal antitrust law called for by *United States v. National Association of Securities Dealers, Inc.*, 422 U.S. 694, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975).

### III

The defendants argue that the Local Government Antitrust Act of 1984, 15 U.S.C. §§ 34 *et seq.*, absolutely bars any claims for damages, costs, interest and attorneys' fees from both the City and the private defendants. Having determined that the City is relieved of antitrust liability by state action immunity, the Court need not address this argument as directed at the City.

■ As to the private defendants, the Local Government Antitrust Act states:

No damages, interest on damages, costs or attorneys' fees may be recovered un-

der Section 15, 15a, or 15c of this title in any claim against a person based on any official action directed by the local government, or official or employee thereof acting in an official capacity. 15 U.S.C. § 36.

Defendants argue that the legislative history indicates that:

In referring in Section 4 to the application of the antitrust laws to the conduct of non-governmental parties directed by a local government, the conferees borrowed this phrase "official action directed by a local government" from *Parker v. Brown*, 317 U.S. 341, 351 [63 S.Ct. 307, 313, 87 L.Ed. 315] (1943); and the conferees intend that *Parker* and subsequent cases interpreting it shall apply by analogy to the conduct of a local government in directing the actions of nongovernmental parties, as if the local government were a state.

H.Con.Rep. No. 98–1158, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Admin.News 4602, 4627.

Defendants argue that the requirement of active supervision by the City is met in this case because the City wrote an ordinance, developed a comprehensive request for proposals, held public hearings, and executed a franchise agreement giving it power to monitor Barden's performance as franchisee.

Plaintiff responds that on the current record there is a genuine issue of material fact as to the level and nature of the City's supervision of Barden Cablevision, in particular because of plaintiff's allegation that the ordinance and request for proposals relied on by defendants as mechanisms of supervision were, in fact, continually changed to accommodate Barden and disadvantage other bidders. The Court agrees, and declines to grant summary judgment in favor of defendants based on the Local Government Antitrust Act at this time.

### IV

Defendants argue that, in the instant suit, plaintiff alleges the same facts as it did in the 1983 lawsuit filed in Wayne

County Circuit Court, and asserts the same basic legal theories that were, or could have been, raised in that unsuccessful suit. Therefore, it is claimed that the instant suit is barred by res judicata. The Court has already described the substance of the state court lawsuit, which was dismissed in November 1983 on the grounds that, under Michigan law, a disappointed bidder lacked standing to challenge the award of a public contract.

■ The doctrine of res judicata provides that a final judgment bars parties or their privies from relitigating issues that were raised, or that could have been raised, in the first action. *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982). A federal court must give a state court judgment the same preclusive effect as would court of that state. *Kremer, Id.; Cooper v. Oak Park School Dist.*, 624 F.Supp. 515 (E.D.Mich. 1986).

■ Defendants' defense of res judicata must fail since a Michigan court would not apply the doctrine on the facts of this case. The Michigan law of res judicata was stated in *Braxton v. Litchalk*, 55 Mich.App. 708, 717–18, 223 N.W.2d 316 (1974), as follows:

> [T]he doctrine of res judicata is applicable to a second suit involving the same cause of action as that raised in the first suit, and will bar the relitigation of issues which actually were or might have been presented before the court in the first action.... [R]es judicata bars a subsequent suit between the same parties or their privies when the same cause of action is raised in a subsequent suit, *and when the facts or evidence essential to the maintenance of both actions are identical.* (emphasis added)

The court in *Detroit v. Nortown Theatre, Inc.*, 116 Mich.App. 386, 323 N.W.2d 411 (1982) reiterated that standard, and explained:

> The more difficult aspect of res judicata is determining if the trials involve the same cause of action. In *Rose v. Rose*, 10 Mich.App. 233, 236–37, 157 N.W.2d 16

(1968), this Court adopted the following guidelines:

. . . . .

> "In the application of the doctrine of *res judicata*, if it is doubtful whether a second action is for the same cause of action as the first, the test generally applied is to consider the identity of facts essential to their maintenance, or whether the same evidence would sustain both. If the same facts or evidence would sustain both, the two actions are considered the same within the rule that the judgment in the former is a bar to the subsequent action. If, however, the two actions rest upon different states of facts, or if different proofs would be required to sustain the two actions, a judgment in one is no bar to the maintenance of the other."

*Id.* at 393, 323 N.W.2d 411.

The instant case and the previous case in Wayne County Circuit Court rest on different sets of facts since many of the plaintiff's allegations of wrongdoing concern events that occurred long after the state court actions was completed. *See also, Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955), and *Cream Top Creamery v. Dean Milk Co.*, 383 F.2d 358 (6th Cir.1967). Therefore, the present lawsuit is not barred by *res judicata*.

### V

■ The Court rejects defendants' argument that plaintiff is collaterally estopped from asserting its due process claim by operation of the state court decision holding that plaintiff, as a disappointed bidder, had no standing to challenge the award of the cable franchise. Plaintiff's standing to raise a constitutional due process claim was not actually litigated in the state court action. *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).

■ Nonetheless, plaintiff's due process claim in Count IV of the complaint

must be dismissed. In order to claim that it has been denied procedural due process, plaintiff must be able to show that it had a protected property interest. In order to have a protected property interest, plaintiff must have a legitimate claim of entitlement from a state law source to award of the cable franchise. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Gold Cross Ambulance & Transfer v. City of Kansas City*, 705 F.2d 1005 (8th Cir.1983); *cert. denied* 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985); *Kasom v. City of Sterling Heights*, 600 F.Supp. 1555 (E.D.Mich.1985), *aff'd*, 785 F.2d 308 (6th Cir.1986).

Plaintiff has no such legitimate claim of entitlement to award of the franchise. The City of Detroit in this case reserved the right to reject all bids. Further, the law of Michigan gives no rights to unsuccessful bidders. *City of Detroit v. Wayne Circuit Judge*, 128 Mich. 438, 87 N.W. 376 (1901); *Talbot Paving Co. v. City of Detroit*, 109 Mich. 657, 67 N.W. 979 (1896); *Rayford v. City of Detroit*, 132 Mich.App. 248, 347 N.W.2d 210 (1984); *Malan Construction Corp. v. Board of County Road Commissioners*, 187 F.Supp. 937 (E.D.Mich.1960). Under similar circumstances, courts have rejected plaintiffs' claims to have protected property interests. *Gold Cross Ambulance*, 705 F.2d 1005 (8th Cir.1983); *Kasom*, 600 F.Supp. 1555 (E.D.Mich.1985); *ARA Services Inc. v. School Dist. of Philadelphia*, 590 F.Supp. 622 (E.D.Pa.1984).

Plaintiff's heavy reliance on the case of *Three Rivers Cablevision, Inc. v. City of Pittsburgh*, 502 F.Supp. 1118 (W.D.Pa. 1980) is ill founded. The court in *Three Rivers* found that a disappointed cable bidder was entitled to due process, consisting of a non-arbitrary exercise by the city of its discretion in making the franchise award under the City Code. However, the Court's decision rested on its belief that the law of Pennsylvania provided that, in the letting of a public contract, a city must determine the identity of the lowest responsible bidder in a non-arbitrary fashion. This analysis of Pennsylvania law has been discredited. *ARA Services Inc.*, 590 F.Supp. 622 (E.D.Pa.1984). Furthermore, as the Court

has indicated above, the law of Michigan gives no such rights to disappointed bidders. See *Kasom*, 600 F.Supp. 1555 (E.D. Mich.1985).

Since plaintiff has no protected property interest in the operation of the cable bidding process, its claim for denial of procedural due process must be dismissed.

## VI

Count V of the Complaint alleges that the City violated the First Amendment by awarding only one city-wide cable TV franchise. This claim was not addressed in defendants' motion to dismiss, and the Court makes no ruling on it.

## VII

 Finally, the Court finds that, in view of the law of Michigan that disappointed bidders have no standing to challenge the award of public contracts, plaintiff has no standing to assert its state law claim for waste. Plaintiff has tried to distinguish this claim from its breach of contract and promissory estoppel claims brought in state court by claiming that "The City's allowing modifications to defendant's proposal that makes that proposal grossly inferior to the one that was accepted" takes the claim out of the class of unsuccessful bidder cases and raises the issue of "waste" under state law. However, not even claims of fraud or conspiracy have been held to give unsuccessful bidders a cause of action, because honest and competitive bidding is not intended to protect the bidders, but rather is designed to protect the taxpayers from fraudulent and dishonest expenditures. Michigan courts therefore hold that only the public, and not the bidder, has standing to challenge the bidding process. See *Malan Construction Corp. v. Board of County Road Com'rs*, 187 F.Supp. 937 (E.D.Mich. 1960 (applying Michigan law)). Therefore, under the law of Michigan, plaintiff has no standing to allege "waste," and this count must be dismissed.

An order may be presented embodying the findings herein.