**CITY COMMUNICATIONS, INC., Plaintiff–Appellant,**

v.

**The CITY OF DETROIT; Barden Cable–Vision; and MacLean–Hunter, Defendants–Appellees.**

**Nos. 88–1965, 88–2138.**

United States Court of Appeals, Sixth Circuit.

Argued Aug. 15, 1989.

Decided Nov. 1, 1989.

William M. Saxton, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., Peter S. Greenberg, argued, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for plaintiff-appellant City Communications, Inc.

William D. Sargent, I.W. Winsten, argued, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for defendant-appellee City of Detroit.

Fred W. Freeman, Robert W. Powell, Dickinson, Wright, Moon, Van Dusen & Freeman, W. Gerald Warren, argued, Detroit, Mich., for defendant-appellee Barden Cable–Vision.

William J. DeBiasi, Taylor, Mich., for defendant-appellee MacLean Hunter.

Before JONES and MILBURN, Circuit Judges, and BELL, District Judge *.

* Honorable Sam H. Bell, United States District Judge, Northern District of Ohio, sitting by designation.

MILBURN, Circuit Judge.

Plaintiff-appellant City Communications, Inc., an unsuccessful bidder for a franchise to install a cable television system in the City of Detroit, appeals the multiple summary judgments of the district court dismissing its First Amendment and antitrust claims against the City of Detroit and the successful bidder, Barden Cable–Vision Company. For the reasons that follow, we affirm.

I.

A. *Procedural History*

In 1982, the City of Detroit issued a Request for Proposals ("RFP") to construct, operate, and maintain a cable television system in the City. Plaintiff-appellant City Communications, Inc. ("CCI") and defendant-appellee Barden Cable–Vision ("Barden") of Detroit were among the bidders. In July 1983, the Detroit City Council awarded a *non-exclusive franchise* to Barden.

CCI filed the complaint that is the subject of this appeal on March 18, 1986. The complaint alleged violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, the First and Fourteenth Amendments to the United States Constitution, and state law. The named defendants were the City of Detroit, Barden, and Mac-Lean–Hunter Cable TV, Inc. ("MacLean–Hunter"), a Canadian corporation that is part owner of the Detroit cable franchise as the result of an assignment by Barden.

The defendants moved to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 56. The district court dismissed CCI's antitrust and Fourteenth Amendment claims against the City and the state law claims against all defendants. However, the district court left intact CCI's First Amendment claims against the City and its antitrust claims against the private parties. *See City Communications, Inc. v. City of Detroit,* 650 F.Supp. 1570 (E.D.Mich.1987) (*City Communications I*) (as the district court considered motions outside the pleadings in ordering a dismissal of these claims, the dismissal should be treated as a summary judgment). The district court later denied the defendants' motions to reconsider or to certify for an interlocutory appeal. *See City Communications, Inc. v. City of Detroit,* 660 F.Supp. 932 (E.D.Mich.1987) (*City Communications II*).

CCI then moved for summary judgment on its First Amendment claim against the City. The City responded with a cross-motion for summary judgment, arguing, among other things, that the case should be dismissed on ripeness and standing grounds. The district court granted summary judgment in favor of the City and dismissed CCI's First Amendment claims without prejudice. *See City Communications, Inc. v. City of Detroit,* 685 F.Supp. 160, 164 (E.D.Mich.1988) (*City Communications III*).

On September 8, 1988, pursuant to Fed. R.Civ.P. 54(b), the district court entered a final judgment in favor of the City as to all of CCI's claims against it. CCI filed a timely notice of appeal to this court on September 20, 1988, which was docketed as No. 88–1965.

Meanwhile, on June 1, 1988, defendants Barden and MacLean–Hunter filed a motion for summary judgment on CCI's antitrust claims. On September 28, 1988, the district court granted summary judgment in favor of Barden and MacLean–Hunter, *see City Communications, Inc. v. City of Detroit,* 695 F.Supp. 911, 916 (E.D.Mich. 1988) (*City Communications IV*), and entered its final judgment dismissing the case on October 14, 1988. On October 26, 1988, CCI filed a timely notice of appeal, which was docketed in this court as No. 88–2138. On November 28, 1988, the parties filed a joint motion and stipulation to consolidate their appeals, which was granted.

B. *Facts*

In April 1981, the Detroit City Council enacted ordinances aimed at establishing a cable television system for the City. One ordinance established the Detroit Cable Communications Commission to review all applications and recommend a franchise to the Mayor. In August 1982, the City is-

sued a Request for Proposals to provide cable television services for the City.

Three bidders responded to the RFP—plaintiff-appellant CCI, defendant-appellee Barden, and Detroit Inner–Unity Bell Cable System ("DIUB", not a party to this action). Each bid was accompanied by a bidding fee of $10,000. The bids were evaluated for technical and financial soundness and by other objective criteria. One of the City's prime concerns was "cream skimming," that being the practice (in its extreme) of installing cable service in affluent subdivisions, where installation costs are low, equipment damage is minimal and customers typically order extra services and pay their bills regularly, and slighting inner-city areas. One reason the City elected to award a single, city-wide *non-exclusive franchise* was to ensure that the franchisee could and would provide equal services to all residents.

In July 1983, the City awarded the franchise to Barden. The *non-exclusive franchise* was to commence on August 31, 1983, and continue for fifteen years, unless terminated or forfeited by the City. The award was conditioned upon Barden's ability to demonstrate an unconditional financial commitment for constructing and operating the cable system by August 31, 1984.

In August 1984, Barden notified the City that it could not meet the August 31 deadline. It also sought to modify the system it had agreed to install. The City agreed to extend the deadline by a month, in order that the Commission could hold public hearings on Barden's requested modifications. The Commission initially recommended that Barden's franchise be terminated. However, before the City acted, Congress passed the Cable Communications Policy Act of 1984, 47 U.S.C. §§ 521–559. The Commission then retracted its recommendation of termination, and the City granted Barden additional time to secure its financing.

In 1985, Barden requested additional modifications to the system it was to install, and in May and December of that year, the City agreed to Barden's requested modifications. These modifications included changing the proposed structure of the cable system; elimination of $38 million in proposed grants to the City; reducing the number of channels in the system from 112 to 78; increasing the construction time by three years, to a total of 5½ years; assigning defendant-appellee MacLean–Hunter a 40 percent or greater ownership interest in the City's system; and reducing Barden's construction expenditures by approximately one-third.

During the course of the litigation in the district court, *the City indicated it would consider awarding a second cable franchise. City Communications III*, 685 F.Supp. at 162. *CCI informed the City in a letter that it was "not adverse" to competing for a second system. In a letter dated December 2, 1987, the City responded by stating that CCI would have to submit a detailed plan for a second cable system before the City could consider awarding a second franchise. Id.* At issue in this appeal are the summary judgments granted by the district court.

## II.

### A.

Our review of a district court's grant of summary judgment is *de novo. Pinney Dock & Transport Co. v. Pennsylvania Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir.), *cert. denied sub nom. Pinney Dock & Transport Co. v. Norfolk & Western Ry. Co.*, —— U.S. ——, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). We must view all facts and inferences drawn therefrom "in the light most favorable to the non-moving party," *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987), as the party moving for summary judgment carries the burden of showing "no genuine issue of material fact exists." *Id.*

Yet, in the face of a summary judgment motion, the moving party may not rest on its pleadings, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), but must come forward with some probative evidence to support its claims and make it necessary to resolve differences at trial. *60 Ivy Street Corp.,*

822 F.2d at 1435. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original).

In determining whether an agreement or conspiracy existed for the purposes of the antitrust law, a plaintiff "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1471, 79 L.Ed.2d 775 (1984)). "[C]onduct that is as consistent with permissible competition as with illegal conspiracy does not, without more, support even an inference of conspiracy." *Matsushita*, 475 U.S. at 597 n. 21, 106 S.Ct. at 1362 n. 1.[1]

### B.

On August 15, 1989, shortly before oral argument was scheduled in this case, the City moved for dismissal on the ground that CCI's charter had become void and the corporation lacked standing. We proceeded to hear oral argument and ordered the parties to file supplemental briefs on the challenge to CCI's standing. Our analysis leads us to the conclusion that CCI has standing to bring this appeal.

CCI commenced this action on March 18, 1986, while it was a corporation in good standing under Michigan law. CCI maintained that status until May 15, 1989, when it was dissolved by state law for failure to file annual reports and pay state filing fees for two consecutive years. *See* Mich. Comp.Laws Ann. § 450.1922(1) (West Supp. 1989). Under this provision of the Michigan Business Corporation Act, a corpora-

tion is automatically dissolved by operation of law upon the failure to file annual reports and pay annual filing fees for two consecutive years. *Id.*

A corporation so dissolved "may renew its corporate existence ... by filing the reports and paying the fees for the years for which they were not filed and paid, and for every subsequent intervening year, together with the penalties provided by [§ 450.1921]." Mich.Comp.Laws Ann. § 450.1925(1) (West Supp.1989). "Upon compliance with the provisions of this section, the rights of the corporation shall be the same as though a dissolution or revocation had not taken place, and all contracts entered into and other rights acquired during the interval shall be valid and enforceable." *Id.* at section 450.1925(2).

On August 24, 1989, after we heard oral argument, CCI filed the appropriate reports and paid the appropriate fees and penalties and has had its corporate existence renewed. The issue we face is the effect of the gap in CCI's corporate existence between May 15, 1989, and August 24, 1989, on CCI's standing to maintain this appeal.

The City insists in its brief, conclusory argument that "[g]iven its dissolution, CCI lacked standing to proceed further and must be deemed to have abandoned its appeal." Appellee reply brief at 2. The City further insists that while CCI could renew its corporate existence under state law, that does not cure the gap in its existence for purposes of determining a party's standing to bring a claim in federal court.

In a similarly conclusory argument, CCI asserts that the renewal of its corporate existence under state law is sufficient to preserve its standing in this court. CCI argues in the alternative that had it not renewed its existence, it still would have standing to maintain this appeal as a corporation winding up its affairs. We find nei-

---

**1.** CCI has conceded there was no corruption in the City's decision to award the franchise to Barden. In an interrogatory answered March 4, 1988, plaintiff stated it did not contend that

Barden or MacLean–Hunter "engaged in kickbacks or bribes or anything of that nature." *City Communications IV*, 695 F.Supp. at 914.

ther of the parties' briefs or arguments to be helpful in resolving this issue.[2]

Federal courts are restricted to adjudicating "cases" and "controversies." U.S. Const. art. III. This restriction is anchored in the separation of powers of the federal government, *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 471–76, 102 S.Ct. 752, 757–61, 70 L.Ed.2d 700 (1982), and has given rise to several doctrines "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

■ One of these jurisprudential doctrines limiting the jurisdiction of federal courts is "standing," which focuses *on the party* bringing claims into federal court, not the claims themselves. "Typically, however, the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984). The determination of whether a plaintiff has standing requires a court to evaluate whether and to what degree the party has personally suffered harm or threatened harm, whether that harm or threatened harm can be fairly traced to the defendant's alleged illegal conduct, and whether the plaintiff's alleged harm is likely to be redressed by the relief he requests. *See Allen,* 468 U.S. at 751–53, 104 S.Ct. at 3324–26; *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758–59.

■ A plaintiff must maintain standing throughout all stages of his litigation. *See Karcher v. May,* 484 U.S. 72, 108 S.Ct. 388, 392–93, 98 L.Ed.2d 327 (1987); *Golden v. Zwickler,* 394 U.S. 103, 108–110, 89 S.Ct.

956, 959–60, 22 L.Ed.2d 113 (1969); *Tucker v. Phyfer,* 819 F.2d 1030, 1034 (11th Cir. 1987); *Safir v. Dole,* 718 F.2d 475, 481 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1206, 104 S.Ct. 2389, 81 L.Ed.2d 347 (1984). Therefore, a plaintiff's standing is evaluated at the time it is challenged. *See Golden,* 394 U.S. at 108, 89 S.Ct. at 959–60; *Safir,* 718 F.2d at 481.[3] The question for us is whether CCI, having been dissolved and subsequently renewed as a corporation, has maintained its standing in this litigation.

■ The City is correct in insisting that standing is a matter of federal law, not state corporate law. Yet, given the nature of the dispute, we would be remiss in ignoring the intent and operation of the applicable state law. As described above, the Michigan Business Corporation Act automatically dissolves corporations that fail to file annual reports and pay annual filing fees.

"[T]he provision suspending the powers of a corporation was intended by the Legislature merely to enforce payment of fees and compel compliance with statutory duties." *Michigan Rural Dev. v. El Mac Hills Resort,* 34 Mich.App. 505, 509, 191 N.W.2d 733, 735 (1971) (discussing the statutory predecessor to Mich.Comp.Laws Ann. § 450.1922). "As a result, where a corporation has cured its default, whether due to pressure caused by inability to proceed with a lawsuit or by inability to exercise some other corporate power, the purposes of the statute have been fulfilled and no further sanction is necessary." *Id.*

In *Michigan Rural Dev.,* 191 N.W.2d at 733, the plaintiff Michigan corporation sued on a contract in March 1970. In May 1970, it was dissolved by the state for failure to file annual reports and pay filing fees for two consecutive years. In July 1970, the defendant moved for accelerated judgment,

---

**2.** Given our disposition of this issue, we need not reach the parties' arguments concerning the proper activities of corporations that are winding up their affairs.

**3.** This might appear to be at odds with our decision in *Senter v. General Motors Corp.,* 532 F.2d 511 (6th Cir.1976), in which we stated that

"[s]tanding is determined as of the date the suit is filed." *Id.* at 520. But that case involved a Title VII class action and the appropriateness of the plaintiff as the named representative—specific issues inapplicable to this case. Therefore, we now measure CCI's standing at the time the City challenged it.

based on the corporation's dissolution. In the face of the defendant's motion, the corporation, like CCI in this case, filed the appropriate reports, paid its fees and penalties, and "renewed" its corporate existence. The Michigan Court of Appeals found the purpose of the statute had been satisfied, and "a corporation is entitled to proceed with a pending lawsuit if it cures its default at any time prior to actual dismissal of a suit." *Id.* at 735. *See also Shurlow Tile & Carpet v. Dahlmann Bldg. Co.*, 54 Mich.App. 180, 220 N.W.2d 732, 734 (1974) (holding a corporation dissolved by state law after it began performing a contract could enforce the contract after renewing its corporate existence).

In earlier decisions, Michigan courts established that a corporation dissolved for failure to file annual reports and to pay filing fees

> does not cease to exist, but remains a body corporate to hold and have possession of its property and to conserve the same until due proceedings are had either to cure the default, which caused the loss of the charter, or to wind up its affairs in an orderly manner.

*Ruzitz v. Serbian Nat. Home Soc.*, 315 Mich. 292, 298, 24 N.W.2d 125, 128 (1946); *see also Vlasic Foods Co. v. Russek*, 382 Mich. 544, 170 N.W.2d 827, 829–30 (1969); *Stott v. Stott Realty Co.*, 288 Mich. 35, 284 N.W. 635 (1939). A corporation dissolved by state law is not absolutely void because the statute providing for dissolution "must be read in light of the statute providing for retroactive reinstatement of the charter." *Bergy Bros., Inc. v. Zeeland Feeder Pig, Inc.*, 415 Mich. 286, 293–96, 327 N.W.2d 305, 308 (1982). The Michigan Supreme Court continued to explain in *Bergy Bros.* that "[w]here ... the corporate charter has been reinstated pursuant to the statute, the corporation should be considered to have had at least de facto existence during the period of forfeiture...." *Id.* 327 N.W.2d at 309.

We note in passing that Michigan law is not unique in providing that corporations may be deemed to have maintained de facto corporate existence during the period they were dissolved because of a failure to file reports and pay fees. In *In re Cedar Tide Corp.*, 859 F.2d 1127, 1132 (2d Cir.1988), *cert. denied sub nom. Chandler's Cove Inn Ltd. v. Cedar Tide Corp.*, —— U.S. ——, 109 S.Ct. 1933, 104 L.Ed.2d 405 (1989), and *In re Martin–Trigona*, 760 F.2d 1334, 1342–43 (2d Cir.1985), the Second Circuit Court of Appeals was faced with provisions in New York and Connecticut law that dissolved and reinstated corporate charters similar to the Michigan statutes in this case. The court there held that corporations dissolved by state law maintained sufficient corporate existence to be entitled to reorganize pursuant to Chapter 11.

The foregoing convinces us that corporations that are dissolved by Michigan law such as CCI do not automatically become non-entities in Michigan. Moreover, if they renew their corporate existence, they are deemed "to have had at least de facto existence" during the gap in their charter. *Bergy Bros.*, 327 N.W.2d at 309. This case does not compare to *Karcher*, 108 S.Ct. at 388, where the petitioners filed an action as officers of their state legislature and were deemed to have lost their standing when, by the time they appeared in the Supreme Court, they had lost their state legislative offices. Nor is this a case such as *DeFunis v. Odegaard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), where the petitioner challenging a law school's admission policies was scheduled to graduate from that law school before the Supreme Court could render a decision on his claims.

In those cases and other cases we have found, where the plaintiffs have lost their standing during the course of litigation, it appears that either the plaintiffs underwent a significant transformation of legal status or that events rendered the plaintiffs' claims moot. In either situation, developments made it extremely unlikely that the plaintiff could still show he had suffered harm or threatened harm, or that his alleged injury would be redressed by the remedy he sought.

In this case, however, CCI has maintained an official or a de facto existence recognized by state law since initiating this

action. CCI can make the same showing of injury as it could the day it filed its complaint, and it appears just as likely today as then that its alleged injury would be redressed by the remedy it seeks. There is no question that the alleged injury can be fairly traced to the alleged illegal conduct of the City and the other defendants.

It is true that federal jurisprudential concerns, not state corporate law, determine a party's standing. However, in evaluating a party's standing, we must look past mere labels to determine "whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen,* 468 U.S. at 752, 104 S.Ct. at 3325. Just as a corporate charter does not automatically confer standing, temporary revocation of that charter does not deprive a party of standing. Moreover, it would further no federal purposes to attach such significance to a temporary corporate dissolution which Michigan courts themselves would overlook. Therefore, we hold that this appeal remains a live case or controversy, and CCI has standing to bring these claims into this court.

### III.

#### A. *Antitrust Claims*

■ CCI has claimed violations of sections one and two of the Sherman Antitrust Act. With regard to the section one claims, we agree with the district court that the City is immune from antitrust liability on the ground of the state action exemption. *See Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985); *Consolidated T.V. Cable Serv. v. City of Frankfort,* 857 F.2d 354 (6th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1537, 103 L.Ed.2d 842 (1989). We also agree with the district court that the private defendants are entitled to protection under the state action exemption. *See Southern Motor Carriers Rate Conference v. United States,* 471 U.S. 48, 57–59, 105 S.Ct. 1721, 1726–28, 85 L.Ed.2d 36 (1985).

CCI's section two claim must also fail as it has not produced any evidence that the parties have attempted to attain monopoly

power with a dangerous probability of success. *See Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818, 823 (6th Cir.1982). In this connection, we note that the cable television franchise awarded by the City to Barden was *non-exclusive,* and that the City indicated it would consider awarding a second cable franchise, *City Communications III,* 685 F.Supp. at 162. We have further noted, as earlier stated, that while CCI informed the City that it was not "adverse" to competing for a second system, it never applied for a second franchise even though the City invited it to do so. *Id.* Finally, we would note in passing that the *state action exemption* would be applicable to this claim even if a monopoly were involved. *See Town of Hallie,* 471 U.S. at 38–39, 105 S.Ct. at 1716–17; *Consolidated T.V. Cable Serv.,* 857 F.2d at 359–61.

#### B. *CCI's First Amendment Claim*

The City asserts that CCI's First Amendment claim is barred by the doctrine of res judicata. For the purposes of argument, it accepts CCI's assertion that its claim ripened "at the latest" when the City awarded a franchise to Barden in July 1983. Appellant's Brief p. 20. It argues that CCI could and should have raised the issue in the action it filed in state court in July 1983 challenging the award to Barden. Having failed to raise the First Amendment claim that arose from the cause of action it litigated in the prior state proceeding, CCI has split its cause of action and lost the right to raise the First Amendment claim in a subsequent proceeding.

CCI did not originally raise a constitutional ground in its state court action, but tried to argue during a state court hearing in October 1983 that the City's grant of the non-exclusive franchise to Barden was unconstitutional. CCI's counsel specifically asked for, and received, time to file a motion to amend CCI's state court complaint to add constitutional claims. J.A. 312. However, CCI never followed up on its request, and the state court's judgment against CCI was affirmed in the Michigan Court of Appeals. Thus, it appears that

CCI was aware of a potential First Amendment claim it had against the City, and it could have, and apparently did, consider bringing it in the prior state court proceeding.

The preclusive effect of a prior state court judgment is determined by the law of that state. *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 482, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982). The doctrine of claim preclusion, or res judicata, is invoked to prevent endless litigation, vexation, and confusion for the litigants and ineffective use of judicial resources. *Rogers v. Colonial Federal Sav. & Loan Ass'n*, 405 Mich. 607, 615, 275 N.W.2d 499, 502 (1979). Since 1980, Michigan courts have followed a broad application of res judicata, using it to bar *both* claims actually litigated by parties in prior actions *and* claims that could have been, but were not, litigated. *See Gose v. Monroe Auto Equip. Co.*, 409 Mich. 147, 162–63, 294 N.W.2d 165, 167 (1980); *see also West Michigan Park Ass'n., Inc. v. Fogg*, 158 Mich. App. 160, 164, 404 N.W.2d 644, 646 (1987) (per curiam); *Vutci v. Indianapolis Life Ins. Co.*, 157 Mich.App. 429, 436, 403 N.W.2d 157, 161 (1987).

In its first review of this case, the district court stated that a Michigan court would not apply the doctrine of res judicata to the First Amendment claim. *City Communications I*, 650 F.Supp. at 1580. The district court did not consider Michigan courts' broad application of the doctrine nor the state's decisional rule prohibiting parties from splitting their causes of action in piecemeal litigation. *See Eyde v. Charter Township of Meridian*, 118 Mich.App. 43, 47–50, 324 N.W.2d 775, 777 (1982). Moreover, *City Communications I* was premised on the court's acceptance, *arguendo*, of CCI's contention that its First Amendment claim arose after the state court action was completed. *City Communications I*, 650 F.Supp. at 1580. The district court later noted that it would not reconsider the res judicata issue because it found CCI's claim was not ripe for adjudication. *City Communications III*, 685 F.Supp. at 162.

■ Ripeness is a question of timing. *Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 139, 95 S.Ct. 335, 356, 42 L.Ed.2d 320 (1974). The doctrine dictates that courts should decide only existing, substantial controversies, not hypothetical questions or possibilities. *See* 13 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3532 (1984). Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all. *See Dames & Moore v. Regan*, 453 U.S. 654, 689, 101 S.Ct. 2972, 2991–92, 69 L.Ed.2d 918 (1981); *Pacific Gas & Elec. Co. v. State Energy Resources Conserv. & Devel. Comm'n*, 461 U.S. 190, 200–01, 103 S.Ct. 1713, 1720–21, 75 L.Ed.2d 752 (1983) (ripeness turns on whether an issue is "fit" for adjudication and the hardship the parties would suffer should adjudication be withheld).

■ In this appeal, CCI attempts to avoid the district court's ripeness decision by contending that July 1983 is the date its First Amendment claim ripened. It then attempts to avoid the bar of res judicata by asserting post-July 1983 as an "arising date." The inconsistencies and malleability of CCI's arguments betray their lack of legal support. Claims do not ripen into justiciable controversies, then develop, just as events that occur after a claim arises do not reach back and determine when the claim ripened. CCI's contention that its First Amendment claim ripened in July 1983, but then arose and developed later, is nonsensical. We accept as true CCI's asserted ripening date of July 1983, but believe this only strengthens the argument that its First Amendment claim is barred by the doctrine of res judicata.

In its action in state court, CCI sought an injunction because it felt that it, not Barden, was entitled to an *exclusive* franchise. J.A. 198–210. In its complaint filed in the district court, CCI asked for injunctive and declaratory relief to nullify the award to Barden and to require the City to allow CCI to participate in a new round of bidding. J.A. 26. Yet at oral argument, counsel for CCI argued that as an entity engaged in free speech, CCI has a First

Amendment *right* to a franchise to compete with Barden in Detroit. Counsel further argued that CCI's commitment to building a second, competing cable television system could be seen in the affidavit of Roger Freedman, a CCI principal. J.A. 1355–60.

Freedman stated in his affidavit that based upon his experience and knowledge of the Detroit market, he believes CCI could build a second, competing cable television system in Detroit. He also stated that CCI would not study the feasibility of building such a system unless and until it obtains a franchise, but "it is CCI's intention to take whatever actions are necessary for it to participate in cable in Detroit *as soon as it has received a franchise.*" (Emphasis added).

We first point out, as the district court did in *City Communications III,* 685 F.Supp. at 164, that the federal courts are not the cable television franchise distributors for the City of Detroit. Second, contrary to CCI's counsel's argument, Freedman's affidavit does not fortify the company's claim of a *right* to a franchise. Rather, it undermines CCI's assertion that its ability to construct its hypothetical cable system has been stifled by an anticompetitive, monopolistic conspiracy. Moreover, Freedman's claims do not address the mystery of how CCI can have a First Amendment *right* to build a second, competing system in 1989 based upon its application to build an exclusive system in 1982. *See City of Los Angeles v. Preferred Communications,* 476 U.S. 488, 495, 106 S.Ct. 2034, 2038, 90 L.Ed.2d 480 (1986). Freedman's affidavit makes it clear that CCI's failure to obtain a franchise lies—at this stage of events—in its failure to apply for one.

CCI's counsel also argued that this court need not consider whether cable television is a "utility" subject to municipal regulation. However, this court has already found that while a cable television franchise may not be a "utility" within the traditional sense of the word, it burdens public streets, roads and rights-of-way in the same manner as telephone systems or electric utilities, and is subject to City regulation and franchise control under Michigan law. *See* Mich. Const. art. VII, sec. 29; *Communications Systems, Inc. v. City of Danville,* 880 F.2d 887, 892–93 (6th Cir. 1989) (citing *Catalina Cablevision Assoc. v. Tucson,* 745 F.2d 1266, 1269–70 (9th Cir. 1984) ("cable television, like other utilities, is subject to legislative discretion regarding the initial and future number of licensees")); *see also Video Int'l Prod. v. Warner–Amex Cable Communications,* 858 F.2d 1075, 1081 (5th Cir.1988), *cert. denied sub nom. Dallas v. Video Int'l Prod., Inc.* —— U.S. ——, 109 S.Ct. 1955, 104 L.Ed.2d 424 (1989) ("It is the crossing of public ways that gives the City the right to require [cable television operators to obtain] a franchise."); *see also* 47 U.S.C. § 541(a)(2) (cable franchises may authorize construction of cable systems over public rights-of-way and through easements already dedicated to similar uses, *i.e.,* piggybacking cable systems on telephone, electric and other utilities.).

In connection with CCI's First Amendment claim, we note again that CCI has conceded that there was no corruption in the City's decision to award the franchise to Barden. Regarding the post-bid negotiations, we do not believe the district court's finding that the City remained the "effective decision maker" throughout the bargaining is clearly erroneous. Moreover, we find nothing in the record to indicate that CCI has ever met its burden under *Celotex* of coming forth with a modicum of evidence to contest the defendants' contention that the changes negotiated were forced by developments in cable television technology that occurred during the early and middle years of this decade. We also note that CCI has not attacked or even criticized the Cable Communications Policy Act of 1984 (codified at 47 U.S.C. §§ 521–559) which, among other things, permits cable operators to obtain modifications of franchise obligations from franchising authorities where commercial or technological reasons necessitate making such changes. 47 U.S.C. § 545. Thus, we find no basis for CCI's raw assertion that in adapting its system to changes driven largely by tech-

nological and commercial necessities, the City suppressed CCI's free speech and otherwise engaged in impermissible and illegal conduct.

The procedural history and facts of this case demonstrate that CCI's First Amendment claim arose out of the same transaction that gave rise to the contract claims it brought in state court. CCI could have, should have, and indeed was given extra time at its request to add constitutional claims to its complaint in the prior state proceeding. Under Michigan law, CCI is barred from raising the constitutional claims it could and should have raised in the prior state proceeding. Furthermore, this court has held that cable television companies in CCI's position may not revive previously litigated causes of action by raising First Amendment claims they were aware of, or should have been aware of, in prior proceedings. *See Communications Systems, Inc. v. City of Danville*, 880 F.2d at 895–96 (6th Cir.1989) (cable operator's attempt to add a first amendment claim rejected where the operator had a strategic reason for not raising it in its original complaint); *Consolidated T.V. Cable Serv., Inc. v. City of Frankfort*, 857 F.2d 354, 357–58 (6th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1537, 103 L.Ed.2d 842 (1989) (first amendment claim rejected where it was not raised in a prior proceeding).

The conclusion that CCI's First Amendment claim is barred by the doctrine of res judicata is consistent with this court's decision in *Consolidated T.V. Cable Serv.*, 857 F.2d at 356–58. There, the city established a cable network in 1952. In 1959, Consolidated Television Cable Service obtained a six-year franchise to provide cable services to areas of Frankfort not served by the city's network. In 1965, the city refused to renew Consolidated's contract and denied its requests to expand. Consolidated filed actions in the state courts of Kentucky in the 1960s and 70s.

In 1982, after Frankfort again denied its request to expand, Consolidated filed a federal action alleging a deprivation of its civil rights and violations of its constitutional rights. Consolidated did not raise these claims in its previous actions, but this court found them barred by res judicata. The actions involved the same parties, the same evidence, the same factual history, and the same central issues; *viz.*, "[d]id [the city's] methods of making CATV service available to Frankfort violate Consolidated's civil and constitutional rights?" *Frankfort*, 857 F.2d at 358.

As in *Frankfort*, CCI has filed successive actions challenging Detroit's method of franchising cable service for the City. The central issue is the same—the lawfulness of the City's failure to grant CCI a franchise based on its application. The parties are the same, the evidence would have been the same, assuming a ripeness date of July 1983, and the First Amendment claims arise from the same transaction or occurrence that was the subject of the prior state proceeding. Therefore, under Michigan law, the doctrine of res judicata bars CCI's First Amendment claim.

## IV.

For the foregoing reasons, we AFFIRM the summary judgments of the district court dismissing CCI's antitrust claims against the City and the private defendants. We also AFFIRM the summary judgment of the district court as to CCI's First Amendment claim against the City, but on the ground that the claim is barred by the doctrine of res judicata.[4]

---

4. While the district court chose twice not to address the City's res judicata arguments, we affirm a decision that is correct for any reason, regardless of whether that reason was con-sidered below. *Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*, 772 F.2d 214, 216 (6th Cir.1985) (per curiam).